AMERICANS UNITED INCORPORATED AS
PROTESTANTS AND OTHER AMERICANS UNITED
FOR SEPARATION OF CHURCH AND STATE,
AND OTHERS v. INDEPENDENT SCHOOL DISTRICT
NO. 622 AND OTHERS.
MATTHEW STARK v. DUANE J. MATTHEIS,
COMMISSIONER OF EDUCATION, AND OTHERS.*

179 N. W. (2d) 146.

August 7, 1970—Nos. 42351, 42352.

---

\* Record certified to United States Supreme Court September 23, 1970.

*Henry W. Haverstock, Jr.*, for appellants Americans United Incorporated as Protestants and Other Americans United for Separation of Church and State, Gunvaldson, and Krause.

*William I. Kampf*, for appellant Stark.

*Douglas M. Head*, Attorney General, and *James M. Kelley*, Assistant Attorney General, for respondent state officers.

*Doherty, Rumble & Butler, Frank Claybourne*, and *John J. McGirl, Jr.*, for respondent school district and its school board.

*Meier, Kennedy & Quinn, Timothy P. Quinn*, and *Mark Flahavan*, for respondent intervenors.

*S. Louis Shore, Samuel L. Scheiner*, and *Gene H. Rosenblum*, for Minnesota Jewish Community Relations Council, amicus curiae.

OTIS, JUSTICE.

These are consolidated actions for a declaratory judgment challenging the constitutionality of L. 1969, c. 570, which authorizes the use of public funds to transport children to sectarian schools. The trial court in a comprehensive memorandum held that the statute was valid, and we affirm.

The parties have stipulated to the facts, which we summarize as follows: As of August 1969, there were 13,600 children of elementary and secondary school age within the boundaries of Independent School District No. 622, 2,000 of whom were enrolled in sectarian schools during the 1969-1970 school year. In July 1969, the school board of Independent School District No. 622 adopted a resolution authorizing the transportation of children attending sectarian elementary and secondary schools

within its district. The estimated number so benefited was 1,200 students. The cost of transporting children to sectarian schools within District No. 622 for the 1969-1970 school year was estimated at $70,200, of which $32,100 was paid out of state aids and the remainder from school district tax revenues. Ten other school districts have voted to provide similar transportation to sectarian students.[1] All of the children involved are attending schools which conform to the compulsory attendance standards set forth in Minn. St. 120.10, subds. 1 and 2.[2]

By further stipulation the issues presented were these:

"Whether Laws 1969, Ch. 570, is unconstitutional and invalid on one or more of the following grounds:

"(a) That it violates Article IX, Section 1 of the Minnesota Constitution which prohibits public taxation for a private purpose.

"(b) That it violates Article IV, Section 33, of the Minnesota Constitution which prohibits public taxation for a private purpose.

"(c) That it violates Article VIII, Section 2, of the Minnesota Constitution which prohibits the appropriation of public money

---

[1] Because school districts within the corporate limits of Minneapolis and St. Paul are not eligible for state transportation aids, L. 1969, c. 570, is not applicable to that metropolitan area. Minn. St. 124.22, subd. 1.

[2] Minn. St. 120.10, subds. 1 and 2, provides:

"Subdivision 1. Every child between seven and 16 years of age shall attend a public school, or a private school, for a period of not less than nine months during any school year. No child shall be required to attend a public school more than ten months during any school year.

"Subd. 2. A school, to satisfy the requirements of compulsory attendance, must be one in which all the common branches are taught in the English language, from textbooks written in the English language, and taught by teachers whose qualifications are essentially equivalent to the minimum standards for public school teachers of the same grades or subjects. A foreign language may be taught when such language is an elective or a prescribed subject of the curriculum, but not to exceed one hour in each day."

for the support of schools wherein the distinctive doctrines, creed or tenets of any particular Christian or other religious faith are promulgated or taught.

"(d) That it violates Article I, Section 16, of the Minnesota Constitution which prohibits an establishment of a religion by the State.

"(e) That it violates the 'Establishment Clause' of the First Amendment to the Constitution of the United States, and therefore is violative of the Fourteenth Amendment." [3]

The full text of L. 1969, c. 570, is as follows:

*"An Act relating to the health, welfare, and safety of children required to attend elementary and secondary schools; providing for equality of treatment in transportation of such children to and from such schools.*

"Be it enacted by the Legislature of the State of Minnesota:

"Section 1. [Minn. St. 123.76] Education; transportation of school children; policy. In districts where the state provides aids for transportation it is in the public interest to provide equality of treatment in transporting school children of the state who are required to attend elementary and secondary schools pursuant to Minnesota Statutes, Chapter 120, so that the health, welfare and safety of such children, while using the public highways of the state, shall be protected.

"School children attending any schools, complying with Minnesota Statutes, Section 120.10, Subdivision 2, are therefore entitled to the same rights and privileges relating to transportation.

"Sec. 2. [Minn. St. 123.77] Definitions. Subdivision 1. The following words and terms in this act [Minn. St. 123.76 to 123.79] shall have the following meanings ascribed to them.

"Subd. 2. 'District' means any school district or unorganized territory as defined in Minnesota Statutes, Section 120.02.

---

[3] The applicable constitutional provisions are set forth in appendix A.

"Subd. 3. 'School' means any school as defined in Minnesota Statutes, Section 120.10, Subdivision 2.

"Subd. 4. 'School board' means the governing body of any school district or unorganized territory.

"Subd. 5. 'School children' means any student or child attending or required to attend any school as provided in the Education Code, Minnesota Statutes, Chapters 120 to 129.

"Sec. 3. [Minn. St. 123.78] Equal treatment. Subdivision 1. The school board of any district which is now or hereafter eligible to receive state aid for transportation under Minnesota Statutes, Chapters 123 and 124, shall provide equal transportation within the district for all school children to any school when transportation is deemed necessary by any board by reason of distance or traffic condition in like manner and form as provided in Minnesota Statutes, Sections 123.16, Subdivisions 3 and 4; 123.18; 123.39; 124.22; and 124.51, Subdivision 5, when applicable.

"Subd. 2. When transportation is provided, the scheduling of routes, manner and method of transportation, control and discipline of school children and any other matter relating thereto shall be within the sole discretion, control and management of the school board.

"Sec. 4. [Minn. St. 123.79] Funds and aids. Subdivision 1. Such state aids as may become available or appropriated shall be governed by Minnesota Statutes, Section 124.22, be paid to the school district entitled thereto for the equal benefit of all school children, and disbursed in such manner as determined by the board.

"Subd. 2. The board of any district may expend any monies in its treasury, whether received from state or any other source for the purpose of providing equal transportation treatment of all school children attending school.

"Sec. 5. The effective date of this act is July 1, 1969, but

transportation of pupils as provided herein need not be implemented until August 15, 1970.

"Approved May 22, 1969."

Of the issues presented, the most troublesome is whether L. 1969, c. 570, authorizes the use of public money "for the *support* of schools wherein the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect are promulgated or taught," in violation of Minn. Const. art. 8, § 2. (Italics supplied.)

The United States Supreme Court has held that a state statute which authorizes the use of public funds to transport students in sectarian schools is not a violation of U. S. Const. Amends. I and XIV prohibiting Congress and the states from making any law "respecting an establishment of religion, or prohibiting the free exercise thereof * * *." Everson v. Board of Education, 330 U. S. 1, 67 S. Ct. 504, 91 L. ed. 711, 168 A. L. R. 1392. Although we are bound by the Everson decision in interpreting U. S. Const. Amend. I, with respect to the construction of Minn. Const. art. 8, § 2, Everson is simply persuasive and distinguished precedent. Like most of the decisions dealing with the constitutionality of similar statutes, Everson was decided by a divided court. One of the prevailing justices subsequently repudiated his position. The impact of Everson is further diluted by virtue of the differences in the language of the Federal and State Constitutions. A more effective argument can be made for holding that the use of public funds for transporting sectarian students "supports" a parochial school than can be advanced for holding that such use is for the "establishment of religion." Nevertheless, although our statute "goes to the verge of constitutional power," we cannot say it goes beyond that power. Interstate Consol. St. Ry. Co. v. Massachusetts, 207 U. S. 79, 88, 28 S. Ct. 26, 28, 52 L. ed. 111, 116.

On behalf of appellants, it is argued that Minn. Const. art. 8, § 2, prohibiting the use of public money for the support of sec-

tarian schools, was adopted in 1877 with a view to imposing more specific and restrictive limitations than were contained in U. S. Const. Amend. I. Although the Fourteenth Amendment was adopted in 1868, it was not construed to apply the Federal Bill of Rights to the states until long after Minn. Const. art. 8, § 2, was adopted. Cantwell v. Connecticut, 310 U. S. 296, 60 S. Ct. 900, 84 L. ed. 1213.

Appellants point out that the policy recitation in c. 570 is not convincing in so far as it purports to promote the "health, welfare, and safety of children." They note that prior to the act, parochial children were being driven to school by their parents or were transported by bus under private contract. If the state were genuinely concerned with public safety, so they argue, it would provide bussing for all school children, whereas the statute as applied results in transporting only about half those now attending public schools. Consequently, parochial schoolchildren in many areas of the state are not aided by the statute. In any event, it is argued that recitations of the kind contained in the policy statement of c. 570 are not binding on the court.

Finally, appellants contend that transportation is an integral part of education, bringing pupils and teachers together, without either of which there could be no educational process. Whereas publicly financed sewers, roads, and sidewalks benefit parochial schools as well as public schools, they are essentially enjoyed by the whole community and do not merely support the parochial schools which they adjoin. Whatever savings are realized by either parochial schools or the parents of students who attend them are thereby released and made available for other uses, including wholly sectarian purposes. These arguments have been advanced in a line of cases which express a minority view, usually by divided courts. The Delaware Supreme Court in State ex rel. Traub v. Brown, 36 Del. 181, 172 A. 835, held that a statute similar to ours violated Delaware's constitutional prohibition against the use of educational funds "by, or in aid of any sectarian, church or denominational school." 36 Del. 184, 172 A.

836. It concluded that free transportation "helps build up, strengthen and make successful the schools as organizations," an observation thereafter frequently cited. 36 Del. 187, 172 A. 837. The Delaware Supreme Court adhered to its position in Opinion of the Justices (Del.) 216 A. (2d) 668.

What proved to be a leading case soon followed, Judd v. Board of Education, 278 N. Y. 200, 15 N. E. (2d) 576. New York's constitution prohibited the use of public money "directly or indirectly" in aid of any school in which any denominational tenet or doctrine was taught. The New York Court of Appeals rejected the argument that transportation of parochial students aided students and not the school, and laid stress on the fact that free transportation induced attendance. Three judges dissented, arguing that the statute merely implemented the compulsory attendance laws. Subsequently, the New York Constitution was amended to permit bussing of parochial students, and the Judd case was expressly overruled in Board of Education of Central School Dist. No. 1 v. Allen, 20 N. Y. (2d) 109, 281 N. Y. S. (2d) 799, 228 N. E. (2d) 791, *infra.*

The Supreme Courts of Washington, Alaska, Wisconsin, and Hawaii have also held unconstitutional statutes such as chapter 570. Although the decision in Spears v. Honda, 51 Hawaii 1, 449 P. (2d) 130, was unanimous and also dealt with a prohibition against the use of public funds "for the support or benefit of any sectarian or private educational institution," its value as precedent is limited. The debates which preceded the adoption of that constitutional provision made it clear the drafters had expressly rejected the so-called "child-benefit" theory. Consequently, the Hawaii court concluded that sectarian bussing must come, if at all, by constitutional amendment as was done in New York following Judd and in New Jersey following Everson.

Visser v. Nooksack Valley School Dist. No. 506, 33 Wash. (2d) 699, 207 P. (2d) 198, with two dissents, followed the reasoning of Judd and rejected the Everson case as precedent. The court stated that to the extent Everson held transportation was not

"in support" of parochial schools it would not be followed in construing a Washington constitutional prohibition similar to Minn. Const. art. 8, § 2.

A constitutional provision in Alaska also prohibits the use of public funds for the direct benefit of any religious educational institution. By a 2-to-1 vote, the Alaska court held in Matthews v. Quinton (Alaska) 362 P. (2d) 932, that transportation was a direct benefit and the act authorizing it was therefore invalid. An extended dissent observed that the real issue "has to do with the very existence of the sectarian or religious educational institutions, and the belief of some persons in the supremacy of public education administered and controlled by the state." 362 P. (2d) 957.

Finally, a divided Supreme Court of Wisconsin in 1962 struck down a bussing statute which it held violated a constitutional prohibition against the application of public money for the benefit of religious or theological seminaries. State ex rel. Reynolds v. Nusbaum, 17 Wis. (2d) 148, 115 N. W. (2d) 761. The court refused to be bound by a statutory provision which recited that the act related to the safety and welfare of school pupils, language similar to that which prefaces c. 570. The dissent referred to the fact that a proposed constitutional amendment to authorize bussing of parochial students was defeated by a referendum vote in 1946. This suggests that the majority construed the vote to reflect an intent that bussing be prohibited in the absence of such an amendment. The dissent recognized the problem as a difficult and delicate one. It pointed out that any indirect and incidental advantages which accrue to parochial schools should not render the statute invalid if the primary beneficiaries are the children and their parents. It concluded with the observation that a statute should be held unconstitutional only when it appears invalid beyond a reasonable doubt, a principle to which we here subscribe.

Other decisions such as McVey v. Hawkins, 364 Mo. 44, 258 S. W. (2d) 927, and Squires v. Inhabitants of City of Augusta,

155 Maine 151, 153 A. (2d) 80, held bussing statutes invalid on grounds other than constitutional grounds.

Appellate courts in Maryland, California, Kentucky, Connecticut, New York, Pennsylvania, Michigan, West Virginia, as well as New Jersey and the United States Supreme Court in Everson, have sustained statutes which authorize the use of public funds for bussing parochial students. Board of Education of Baltimore County v. Wheat, 174 Md. 314, 199 A. 628 (three judges dissenting) ; Adams v. County Commrs. of St. Mary's County, 180 Md. 550, 26 A. (2d) 377 (one judge dissenting) ; Bowker v. Baker, 73 Cal. App. (2d) 653, 167 P. (2d) 256; Nichols v. Henry, 301 Ky. 434, 191 S. W. (2d) 930; Snyder v. Town of Newtown, 147 Conn. 374, 161 A. (2d) 770; Rhoades v. Abington Twp. School Dist. 424 Pa. 202, 226 A. (2d) 53 (two judges dissenting and no judge concurring in the majority opinion) ; Alexander v. Bartlett, 14 Mich. App. 177, 165 N. W. (2d) 445; State ex rel. Hughes v. Board of Education of Kanawha County (W. Va.) 174 S. E. (2d) 711.

The thrust of these decisions is that whatever support is given to sectarian schools is incidental, and that the children and their parents are the real beneficiaries of public funds. They stress the fact that children are students in parochial schools under compulsory attendance laws, and that public bussing simply permits safe and expeditious compliance with those laws. Such courts uniformly hold these statutes to be a valid exercise of the state's police power and a measure promoting public welfare. They equate bussing with services such as sewers, streets, sidewalks, police, and fire protection which are furnished parochial schools as members of the general public. Some emphasize the value of parochial schools as means of assuming a tax burden the public would otherwise have to bear. State ex rel. Hughes v. Board of Education of Kanawha County, *supra;* Rhoades v. Abington Twp. School Dist. *supra.*

All of these conflicting views were expounded in the Everson case. We have said this was a 5-to-4 decision in which Mr. Justice

Douglas joined the majority. Subsequently, in Engel v. Vitale, 370 U. S. 421, 443, 82 S. Ct. 1261, 1274, 8 L. ed. (2d) 601, 615, he said, "The Everson case seems in retrospect to be out of line with the First Amendment." Again, in Walz v. Tax Comm. 397 U. S. 664, 703, 90 S. Ct. 1409, 1429, 25 L. ed. (2d) 697, 721, he noted by way of dissent:

"* * * [T]he Everson decision was five to four and, though one of the five, I have since had grave doubts about it, because I have become convinced that grants to institutions teaching a sectarian creed violate the Establishment Clause."

Nevertheless, the United States Supreme Court has continued to cite and rely on Everson in a number of recent cases. There is no indication that as presently constituted the court intends to repudiate either the specific rule which it there adopted or the philosophy it expressed regarding the boundary line between church and state.

The question in Everson was whether the First-Amendment prohibition against the establishment of religion was violated by a New Jersey statute which authorized reimbursement out of public funds for expenses incurred by parents in providing bus transportation to children attending parochial schools. The trial court held the statute unconstitutional, and the New Jersey appellate court reversed. Everson v. Board of Education of Ewing Twp. 133 N. J. L. 350, 44 A. (2d) 333. In affirming, the United States Supreme Court acknowledged the difficulty experienced by state courts in drawing the line between legislation which provides funds for the welfare of the general public and legislation designed to support religious institutions. In this context, it defined the purpose of the First Amendment in the following language which was subsequently approved in Illinois ex rel. McCollum v. Board of Education, 333 U. S. 203, 210, 68 S. Ct. 461, 464, 92 L. ed. 649, 658; Abington School Dist. v. Schempp, 374 U. S. 203, 216, 83 S. Ct. 1560, 1568, 10 L. ed. (2d)

844, 855; and Walz v. Tax Comm. 397 U. S. 664, 670, 90 S. Ct. 1409, 1412, 25 L. ed. (2d) 697, 702:

"* * * Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' " 330 U. S. 15, 67 S. Ct. 511, 91 L. ed. 723, 168 A. L. R. 1404.

The court in Everson went on to say that New Jersey could not contribute tax money "to the support of an institution which teaches the tenets and faith of any church" (330 U. S. 16, 67 S. Ct. 512, 91 L. ed. 724, 168 A. L. R. 1405) and suggested that in adopting a bussing statute the state approached the verge of its constitutional power. The fact that children were helped to reach church schools which they might not otherwise attend was not deemed decisive. The court equated such expenditures with police and fire protection, sewage disposal, public highways, and sidewalks which served parochial schools at government expense. The majority then came to the following conclusion:

"* * * The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, re-

gardless of their religion, safely and expeditiously to and from accredited schools.

"The First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach. New Jersey has not breached it here." 330 U. S. 18, 67 S. Ct. 513, 91 L. ed. 725, 168 A. L. R. 1406.

Although, as we have indicated, this court is not bound by Everson in construing the language of the Minnesota Constitution, it is, nevertheless, significant that the United States Supreme Court held that bussing does not "support" parochial schools, language which is contained in Minn. Const. art. 8, § 2.

As we have noted, four judges dissented in two extended opinions. In the dissent of Mr. Justice Rutledge, he stated that transportation aids children in a substantial way to secure religious training and teaching and that transportation for this purpose was as essential to education as the cost of textbooks, school lunches, athletic equipment, and writing material.

"* * * Without buildings, without equipment, without library, textbooks and other materials, and without transportation to bring teacher and pupil together in such an effective teaching environment, there can be not even the skeleton of what our times require. Hardly can it be maintained that transportation is the least essential of these items, or that it does not in fact aid, encourage, sustain and support, just as they do, the very process which is its purpose to accomplish. * * *

"* * * Payment of transportation is no more, nor is it any the less essential to education, whether religious or secular, than payment for tuitions, for teachers' salaries, for buildings, equipment and necessary materials." 330 U. S. 48, 67 S. Ct. 527, 91 L. ed. 740, 168 A. L. R. 1420.

It was not until Abington School Dist. v. Schempp, 374 U. S. 203, 83 S. Ct. 1560, 10 L. ed. (2d) 844, that the Supreme Court attempted to fashion a concrete rule by which legislation of this

kind could be tested. There, the court stated (374 U. S. 222, 83 S. Ct. 1571, 10 L. ed. [2d] 858):

"* * * The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

In a case dealing with a New York statute authorizing public school authorities to loan textbooks to students in parochial schools, the Supreme Court recognized the difficulty of applying this test, Board of Education v. Allen, 392 U. S. 236, 88 S. Ct. 1923, 20 L. ed. (2d) 1060. The court sustained the statute but noted, among other things, that there was no inherent religious significance in bus transportation which the court had before it in Everson. In one of two dissents, Mr. Justice Black observed (392 U. S. 252, 88 S. Ct. 1931, 20 L. ed. [2d] 1071):

"* * * Books are the most essential tool of education since they contain the resources of knowledge which the educational process is designed to exploit. In this sense it is not difficult to distinguish books, which are the heart of any school, from bus fares, which provide a convenient and helpful general public transportation service. With respect to the former, state financial support actively and directly assists the teaching and propagation of sectarian religious viewpoints in clear conflict with the First Amendment's establishment bar; with respect to the latter, the State merely provides a general and nondiscriminatory transportation service in no way related to substantive religious views and beliefs."

Mr. Justice Douglas, also dissenting, stated (392 U. S. 257, 88 S. Ct. 1933, 20 L. ed. [2d] 1073):

210

"Whatever may be said of Everson, there is nothing ideological about a bus. There is nothing ideological about a school lunch, or a public nurse, or a scholarship. The constitutionality of such public aid to students in parochial schools turns on considerations not present in this textbook case. The textbook goes to the very heart of education in a parochial school. It is the chief, although not solitary, instrumentality for propagating a particular religious creed or faith. How can we possibly appove such state aid to a religion? A parochial school textbook may contain many, many more seeds of creed and dogma than a prayer."

In holding that L. 1969, c. 570, authorizing public transportation of parochial school students, does not violate Minn. Const. art. 8, § 2, prohibiting the use of public money for the support of parochial schools, we do so with the conviction that this legislation brings us to the brink of unconstitutionality. Indeed, we may be "too perilously close to that public support of religion forbidden by the First Amendment," to which Mr. Justice Brennan referred in Schempp. 374 U. S. 261, 83 S. Ct. 1592, 10 L. ed. (2d) 880. There the court struck down compulsory Bible reading in public schools and noted that such relatively minor encroachments on the First Amendment are a breach of governmental neutrality which is "today a trickling stream" but "may all too soon become a raging torrent," quoting James Madison as saying, "It is proper to take alarm at the first experiment on our liberties." 374 U. S. 225, 83 S. Ct. 1573, 10 L. ed. (2d) 860. This, too, was the view of Mr. Justice Rutledge in Everson. He admonished against preventing the question from becoming entangled in "corrosive precedents." 330 U. S. 63, 67 S. Ct. 535, 91 L. ed. 748, 168 A. L. R. 1428. However, we are more nearly in accord with the philosophy expressed in Walz, where the court observed that it had been able to chart a course which preserved the freedom and autonomy of religious bodies while avoiding any semblance

of established religion. Mr. Chief Justice Burger there stated (397 U. S. 672, 679, 90 S. Ct. 1413, 1416, 25 L. ed. [2d] 703, 707):

"* * * This is a 'tight rope' and one we have successfully traversed.

\* \* \* \* \*

"The argument that making 'fine distinctions' between what is and what is not absolute under the Constitution is to render us a government of men, not laws, gives too little weight to the fact that it is an essential part of adjudication to draw distinctions, including fine ones, in the process of interpreting the Constitution."

In a separate opinion, Mr. Justice Harlan, commenting on the Chief Justice's observations, refused to "shrink from a first step" simply because the momentum might "plunge the law into pitfalls that lie in the trail ahead. I, for one, however, do not believe that a 'slippery slope' is necessarily without a constitutional toehold. * * * The prospect of difficult questions of judgment in constitutional law should not be the basis for prohibiting legislative action that is constitutionally permissible." 397 U. S. 699, 90 S. Ct. 1427, 25 L. ed. (2d) 719.

We have in mind that this case is neither dissociated from the past nor unrelated to the future. Board of Education v. Barnette, 319 U. S. 624, 661, 63 S. Ct. 1178, 1195, 87 L. ed. 1628, 1649. It is obvious from a casual reading of the daily papers that parochial schools throughout the country are finding it increasingly difficult to secure financing adequate to insure their continued existence. Many have closed and more are threatened. Pressure is being brought within and without state legislatures to subsidize sectarian education in order to keep parochial schools open. The Minnesota Legislature, apparently recognizing that such schools relieve the taxpayers of a burden they would otherwise have to assume, seeks by c. 570 to grant some economic relief to those who attend parochial schools. Here and elsewhere we read that subsidies in other forms will be sought to furnish tuition

grants,[4] salary supplements, textbooks, equipment, supplies and services of a secular nature.[5] It is not our intention to prejudge the constitutionality of these subsidies until and unless the question is submitted in an adversary manner. It may well be that direct aid to students in parochial schools, protecting their immediate health and safety by medical, dental, and nursing services, and perhaps by school lunches, stands on a different footing from subsidies which go to the heart of the learning process.

---

[4] Very recently the Supreme Court of Massachusetts held an annual allotment of $100 to private school pupils unconstitutional as violating a provision against grants of public money for "maintaining or aiding * * * any * * * school * * * or educational * * * undertaking which is not publicly owned * * *." Opinion of the Justices (Mass.) 259 N. E. (2d) 564, 566.

[5] In Opinion of the Justices (Mass.) 258 N. E. (2d) 779, 781, the Massachusetts court held unconstitutional a bill which would authorize the state to purchase secular educational services from parochial schools. Massachusetts held that this violated a constitutional provision which prohibited the use of public money for "maintaining or aiding any school * * * wherein any denominational doctrine is inculcated * * *."

A three-judge Federal court for the District of Rhode Island reached the same conclusion in DiCenso v. Robinson, 316 F. Supp. 112. There, the State of Rhode Island authorized the use of public funds to pay a part of the salaries of teachers of secular subjects in parochial schools. The court held that "sophisticated bookkeeping could pave the way for almost total subsidy of a religious institution by assigning the bulk of the institution's expenses to 'secular' activities." 316 F. Supp. 120. It concluded that the effect of such a subsidy was not only substantial support for a religious enterprise, but embroiled government and religion in a way which the First Amendment was meant to avoid. Consequently, it was a violation of the First Amendment.

The majority of a three-judge United States District Court in Lemon v. Kurtzman (E. D. Pa.) 310 F. Supp. 35, held a similar statute in Pennsylvania valid. The United States Supreme Court noted probable jurisdiction and placed the matter on the summary calender on April 20, 1970. 397 U. S. 1034, 90 S. Ct. 1354, 25 L. ed. (2d) 646.

We intimate no opinion as to whether a valid constitutional distinction may be drawn between these two types of aid or whether either or both will be found valid. We simply inject a caveat that the limitations contained in the Minnesota Constitution are substantially more restrictive than those imposed by U. S. Const. Amend. I. We reiterate that, as presently constituted, this court is of the opinion that c. 570 brings legislation of this kind to the verge of unconstitutionality.

The fact the majority in Everson has reminded us that the wall between church and state "must be kept high and impregnable" (330 U. S. 18, 67 S. Ct. 513, 91 L. ed. 725, 168 A. L. R. 1406) is based on a history of conflict which that court has found occasion to review in numerous opinions. That wall, Thomas Jefferson has said, is not a fine line easily overstepped. The purpose of such separation rests on the belief "that a union of government and religion tends to destroy government and to degrade religion," and stems from an awareness that "governments of the past had shackled men's tongues to make them speak only the religious thoughts that government wanted them to speak." Engel v. Vitale, 370 U. S. 421, 431, 435, 82 S. Ct. 1261, 1267, 1269, 8 L. ed. (2d) 601, 608, 610. Mr. Justice Black in Everson speaks of the quest for religious freedom which prompted our forebears to leave the Old World. Ironically, the "turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy" (330 U. S. 8, 67 S. Ct. 508, 91 L. ed. 720, 168 A. L. R. 1401) was not abated in the New World. Religions which the Colonists sought to escape became firmly entrenched, compelling believers and nonbelievers alike to pay tithes and taxes to perpetuate the prevailing faith. Ultimately, a widespread revulsion to this creeping erosion of religious liberty resulted in a revolt, led by Thomas Jefferson and James Madison, against taxes levied for religion which were about to be imposed by the State of Virginia in 1785. The foundation for the First Amendment was laid in Madison's famous Memorial and Remonstrance.

"* * * In it, he eloquently argued that a true religion did not need the support of law; that no person, either believer or non-believer, should be taxed to support a religious institution of any kind; that the best interest of a society required that the minds of men always be wholly free; and that cruel persecutions were the inevitable result of government-established religions." Everson v. Board of Education, 330 U. S. 1, 12, 67 S. Ct. 504, 509, 91 L. ed. 711, 721, 168 A. L. R. 1392, 1402.

The Remonstrance was largely responsible for defeating the tax and paved the way for the Virginia bill for religious liberty drafted by Thomas Jefferson. It is with this background in mind that we consider the extent to which c. 570 impinges on Minn. Const. art. 8, § 2, and art. 1, § 16.

We find merit in the argument that c. 570 serves a legitimate secular purpose in promoting the safety and welfare of children required to attend school under our compulsory attendance law. Minn. St. 120.10. It has long been held that the requirements of compulsory school attendance are satisifed by enrollment in qualified parochial schools, and that any law restricting attendance to public schools is invalid. Pierce v. Society of Sisters, 268 U. S. 510, 45 S. Ct. 571, 69 L. ed. 1070. Recognizing, as we do, that the statute to some extent, encourages attendance in parochial schools, nevertheless it meets the tests laid down by the Supreme Court to which we have alluded. We do not believe that the purpose and primary effect of the statute is to benefit religion or to support sectarian schools. These results, in our opinion, are purely incidental and inconsequential. Although it may well be that the legislature was motivated to a great extent by a desire to prevent the additional tax burden which would be sustained if parochial schools were required to close, we agree that the statute may be upheld as the safety measure which it purports to be. There can be little question but that school-age children are transported more efficiently, expeditiously, and safely by public buses than they would be if left to their own re-

sources. On this basis, and to the extent that bussing does not directly involve support of the educational process, we find the statute valid.

Lest what we have already said be construed as intimating approval of subsidies which reach into the curriculum, we deem it appropriate to expand on our reasons for regarding support of parochial schools as equivalent to support of religion. As Mr. Chief Justice Burger noted in Walz v. Tax Comm. 397 U. S. 664, 671, 90 S. Ct. 1409, 1412, 25 L. ed. (2d) 697, 703:

"* * * Surely, bus transportation and police protection to pupils who receive religious instruction 'aid' that particular religion to maintain schools that plainly tend to assure future adherents to a particular faith by having control of their total education at an early age. No religious body that maintains schools would deny this as an affirmative if not dominant policy of church schools."

This observation echoes what was said by Mr. Justice Jackson in his Everson dissent (330 U. S. 24, 67 S. Ct. 515, 91 L. ed. 728, 168 A. L. R. 1408):

"I should be surprised if any Catholic would deny that the parochial school is a vital, if not the most vital, part of the Roman Catholic Church. If put to the choice, that venerable institution, I should expect, would forego its whole service for mature persons before it would give up education of the young, and it would be a wise choice. Its growth and cohesion, discipline and loyalty, spring from its schools. Catholic education is the rock on which the whole structure rests, and to render tax aid to its Church school is indistinguishable to me from rendering the same aid to the Church itself."

Later, in Illinois ex rel. McCollum v. Board of Education, 333 U. S. 203, 236, 68 S. Ct. 461, 477, 92 L. ed. 649, 671, Mr. Justice Jackson had occasion to discuss the sectarian nature of teaching in parochial schools:

"* * * Even such a 'science' as biology raises the issue between evolution and creation as an explanation of our presence on this planet. * * *

"But how one can teach, with satisfaction or even with justice to all faiths, such subjects as the story of the Reformation, the Inquisition, or even the New England effort to found 'a Church without a Bishop and a State without a King,' is more than I know. It is too much to expect that mortals will teach subjects about which their contemporaries have passionate controversies with the detachment they may summon to teaching about remote subjects such as Confucius or Mohammed. When instruction turns to proselyting and imparting knowledge becomes evangelism is, except in the crudest cases, a subtle inquiry."

In the same vein are the remarks of the dissenting judges in Board of Education of Central School Dist. No. 1 v. Allen, 20 N. Y. (2d) 109, 122, 281 N. Y. S. (2d) 799, 809, 228 N. E. (2d) 791, 798:

"* * * One of the most important reasons on account of which church communicants have chosen, with much financial sacrifice, to have their children taught in parochial schools, is that they have wanted them to be indoctrinated on these subjects with the church point of view."

This, too, was the attitude of the Supreme Court of Maine in Opinion of the Justices (Maine) 261 A. (2d) 53, 67, where the court said:

"Fundamentally it cannot be gainsaid that the sectarian school exists for the purpose of adding an additional dimension, to-wit, advancement of the faith, to the secular education which it supplies. If the parents sought only the secular education, such is available to them as a matter of right in the public school system. Sectarian school education is selected for its religious atmosphere and teaching."

In sum, our State and Federal Constitutions guarantee the

right of every sect and religion to conduct their schools with virtually unlimited latitude in promoting the doctrines and faiths to which they adhere. This they may do without interference at any level of government, provided they meet the other standards of teaching prescribed by statute. Conversely, no taxpayer need submit to a levy designed to support a doctrine alien to his faith or even one which promotes his faith. It is this fundamental concept, that the state may neither advance nor inhibit religion, which governs our decision and defines permissible limits of legislation under state and Federal law. In this area, government, it is said, must remain entirely neutral. Consequently, if the welfare of the state requires the use of public appropriations to insure the continued existence of sectarian schools, the danger of a breach of the "impregnable wall" between church and state is sufficiently real to suggest the necessity for a constitutional amendment. However, for the reasons we have stated, we find that c. 570 does not exceed the boundary of what is permissible under Minn. Const. art. 1, § 16; art. 4, § 33; art. 8, § 2; or art. 9, § 1, and the judgment of the trial court is therefore affirmed.

Affirmed.

MR. JUSTICE SHERAN, having been a member of the court when this matter was argued and submitted, participated in the consideration and decision of this case.

MR. JUSTICE KELLY, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

### Appendix A

Minn. Const. art. 9, § 1. "* * * Taxes shall be uniform upon the same class of subjects, and shall be levied and collected for public purposes * * *."

Minn. Const. art. 4, § 33. "* * * The legislature shall pass no local or special law * * * authorizing public taxation for a private purpose."

Minn. Const. art. 8, § 2. "The legislature shall make such provisions, by taxation or otherwise, as, with the income arising from the school

fund, will secure a thorough and efficient system of public schools in each township in the State.

"But in no case shall the moneys derived as aforesaid, or any portion thereof, or any public moneys or property, be appropriated or used for the support of schools wherein the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect are promulgated or taught."

Minn. Const. art. 1, § 16. "* * * The right of every man to worship God according to the dictates of his own conscience shall never be infringed, nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of the State, nor shall any money be drawn from the treasury for the benefit of any religious societies, or religious or theological seminaries."

U. S. Const. Amend. I. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."