ELONORA F. BLOOM & others[1] vs. SCHOOL COMMITTEE OF SPRINGFIELD & another.

Hampden. February 15, 1978. — July 20, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

Constitutional Law, "Anti-aid" amendment, Use of public money or property, Schools. Education. School and School Committee.

Statute 1973, c. 1196, amending G. L. c. 71, § 48, by providing that a school committee of a municipality, at the individual request of a pupil in a private school approved under § 1 of c. 76, shall lend free of charge to him textbooks which shall be the same as those purchased by the committee for use in the public schools, is unconstitu-

---

[1] Twelve individuals who, like the plaintiff Bloom, were residents of Springfield.

tional on its face as authorizing the "use" of public property in "maintaining or aiding" private primary or secondary schools in violation of the text and purposes of art. 103 of the Amendments to the Massachusetts Constitution, recasting § 2 of art. 46 of the Amendments. [39–44]

Discussion of cases of the United States Supreme Court bearing on the present decision. [44–47]

Limits of the present decision considered. [47–48]

CIVIL ACTION commenced in the Superior Court on October 27, 1976.

The case was heard by *Cross*, J., on a motion to dismiss.

The Supreme Judicial Court granted a request for direct appellate review.

*Martin B. Margulies* (*Laura Fieber* with him) for the plaintiffs.

*James S. Kaufman*, Associate City Solicitor, for the School Committee of Springfield.

*Mitchell J. Sikora, Jr.*, Assistant Attorney General, for the Attorney General.

KAPLAN, J. The court is presented with the question whether a statute requiring school committees to loan textbooks to pupils attending private schools (sectarian and nonsectarian) offends against the provision of the Constitution of the Commonwealth which forbids the use of public money or property "for the purpose of founding, maintaining or aiding" such schools.

1. *Statement.* Thirteen taxable inhabitants of Springfield (see G. L. c. 40, § 53) sued the local school committee in the Superior Court for Hampden County seeking a declaration and eventual injunctive relief that would prevent the committee from expending money for textbooks under the second paragraph of G. L. c. 71, § 48, which they claimed to be unconstitutional. The Attorney General was allowed to intervene in the action,[2] and the defendant and intervener moved to dismiss the complaint for

[2] As will be seen, although the Attorney General intervened on the side of the defendant committee, on the present appeal he gives the statute only qualified support. See *infra* at 43.

failure to state a claim.[3] The motions were granted without opinion, and from the ensuing judgment the plaintiffs appealed. We granted direct appellate review.

2. *The complaint.* The complaint (as somewhat amplified by an agreed statement)[4] ran thus. By St. 1973, c. 1196 (with amendment by St. 1975, c. 652), the following was added to G. L. c. 71, § 48, which in its first paragraph contains a general authorization of school committees to purchase textbooks and other school supplies: "The committee, at the individual request of a pupil in a private school which has been approved under section one of chapter seventy-six,[5] and which does not discriminate in its entrance requirements on the basis of race or color,[6] shall lend free of charge to him text books which shall be the same as those purchased by the committee for use in the public schools. Such text books shall be loaned free to such pupils subject to such regulations as the committee may prescribe."

The defendant school committee made preparations to carry out the quoted provision, specifying a line item expenditure of $200,000 in its 1976-1977 budget for the purchase of textbooks for use by children attending private elementary and secondary schools in Springfiéld. (This was approximately 32% of the total authorized budget for textbooks and library books.) The committee

[3] There was also a motion to dismiss for failure of the plaintiffs to join the Commonwealth as a party, but the motion was not pressed or ruled on.

[4] The parties entered into an "agreed statement as the record on appeal" under Mass. R. A. P. 8 (d), 365 Mass. 849 (1974), which added to the facts alleged in the complaint.

[5] The reference is to approval by school committees of private schools as qualified to give instruction and to be attended by pupils in fulfilment of the compulsory school attendance law.

[6] This clause, inserted by St. 1975, c. 652, presumably was responsive to *Norwood* v. *Harrison,* 413 U.S. 455 (1973), mentioned below (textbook loans to students in racially exclusive private schools held unconstitutional).

also adopted a "Procedure for Ordering Textbooks for Pupils Attending Private Schools." Pupils could sign up for the books by subject and grade at their respective schools, and school officials would forward the lists to the Springfield school department. Vendors were to deliver the books direct to the schools where they would be stamped with the Springfield public school stamp, and issued to the pupils. In the spring the books would be inventoried at the schools, and those books requested by pupils for the following year were to be collected and stored at the schools, the others returned to the school department by mutual arrangement.

In view of potential litigation, the school committee on advice of counsel did not expend the $200,000 for the stated purpose but transferred the sum to other accounts;[7] nor was any amount budgeted for the book loans for 1977-1978.

The plaintiffs alleged, and now argue, two constitutional points. First, they say the statutory provision is invalid on its face under the terms of our "anti-aid" amendment —art. 46 of the Amendments to the Constitution of the Commonwealth. Second, conceding that the Supreme Court has held textbook loan provisions similar to that in question here to be not invalid on their face under the "no-establishment" clause of the First Amendment, the plaintiffs say that the Court has left open the possibility under that clause that a particular program could be held unconstitutional on a showing that the books might be put to sectarian uses;[8] and the plaintiffs offer to make such a showing if the action is permitted to go to trial.

We agree with the plaintiffs' first contention and need not pass on the second.

---

[7] However, a few dozen books were loaned from stock to pupils at the private Cathedral High School and Community Day School.

[8] Such a possibility is suggested by *Board of Educ. of Cent. School Dist. No. 1* v. *Allen*, 392 U.S. 236, 248 (1968).

3. *The anti-aid amendment.* Under the rather uncertain language of art. 18 of the Amendments as adopted in 1855,[9] public aid had been granted in several instances to private schools, and a major subject of the constitutional convention of 1917 was proposals for a more specific amendment that would prohibit the practice altogether. See 1 Debates in the Massachusetts Constitutional Convention, 1917-1918, at 1-230 (particularly at 63, 174-176, 194) (1919); R.L. Bridgman, The Massachusetts Constitutional Convention of 1917, 22-40 (1923); *Opinion of the Justices,* 214 Mass. 599 (1913). Proponents of such an amendment urged that liberty of conscience was infringed whenever a citizen was taxed to support the religious institutions of others; that the churches would benefit in independence and dignity by not relying on governmental support; and, more generally or colloquially, that to promote civic harmony the irritating question of religion should be removed from politics as far as possible, and with it the unseemly and potentially dangerous scramble of religious institutions for public funds in ever-increasing amounts. 1 Debates, *supra* at 68, 74-79, 161-164.

The amendment that emerged from the convention and was voted by the people, going into effect in October, 1918, was sweeping in its terms: it prohibited any use of public money or property for the aid of any private school, whether or not parochial, and whether elementary, secondary, or on college or university level. The text of the five sections of the amendment as adopted in 1917

---

[9] Article 18 from 1855 until 1918 provided: "All moneys raised by taxation in the towns and cities for the support of public schools, and all moneys which may be appropriated by the state for the support of common schools, shall be applied to, and expended in, no other schools than those which are conducted according to law, under the order and superintendence of the authorities of the town or city in which the money is to be expended; and such money shall never be appropriated to any religious sect for the maintenance, exclusively, of its own school."

is set out in the margin.[10] In 1974 the core prohibitory language of § 2 was recast without (as we think) any change of meaning here material, but an exception was engrafted: the Commonwealth may now make grants-in-aid to private institutions of higher education or their

[10] "Section 1. No law shall be passed prohibiting the free exercise of religion.

"Section 2. All moneys raised by taxation in the towns and cities for the support of public schools, and all moneys which may be appropriated by the commonwealth for the support of common schools shall be applied to, and expended in, no other schools than those which are conducted according to law, under the order and superintendence of the authorities of the town or city in which the money is expended; and no grant, appropriation or use of public money or property or loan of public credit shall be made or authorized by the commonwealth or any political division thereof for the purpose of founding, maintaining or aiding any school or institution of learning, whether under public control or otherwise, wherein any denominational doctrine is inculcated, or any other school, or any college, infirmary, hospital, institution, or educational, charitable or religious undertaking which is not publicly owned and under the exclusive control, order and superintendence of public officers or public agents authorized by the commonwealth or federal authority or both, except that appropriations may be made for the maintenance and support of the Soldiers' Home in Massachusetts and for free public libraries in any city or town, and to carry out legal obligations, if any, already entered into; and no such grant, appropriation or use of public money or property or loan of public credit shall be made or authorized for the purpose of founding, maintaining or aiding any church, religious denomination or society.

"Section 3. Nothing herein contained shall be construed to prevent the commonwealth, or any political division thereof, from paying to privately controlled hospitals, infirmaries, or institutions for the deaf, dumb or blind not more than the ordinary and reasonable compensation for care or support actually rendered or furnished by such hospitals, infirmaries or institutions to such persons as may be in whole or in part unable to support or care for themselves.

"Section 4. Nothing herein contained shall be construed to deprive any inmate of a publicly controlled reformatory, penal or charitable institution of the opportunity of religious exercises therein of his own faith; but no inmate of such institution shall be compelled to attend religious services or receive religious instruction against his will, or, if a minor, without the consent of his parent or guardian.

"Section 5. This amendment shall not take effect until the October first next succeeding its ratification and adoption by the people."

students.[11] We reproduce in the margin the whole of the present § 2,[12] inserted by art. 103 of the Amendments to the Constitution, and set out here the part, important for our present purpose, which carries forward the basic prohibition of 1917: "No grant, appropriation or use of public money or property or loan of credit shall be made or authorized by the Commonwealth or any political subdivision thereof for the purpose of founding, maintaining or aiding any infirmary, hospital, institution, primary or secondary school, or charitable or religious undertaking which is not publicly owned and under the exclusive control, order and supervision of public officers or public agents authorized by the Commonwealth or federal authority or both . . . ."

We think it must be accepted that it would be a transgression of the Constitution for a city or town to loan textbooks to private primary or secondary schools. A pro-

[11] A distinction for purposes of the no-establishment clause between higher education and primary and secondary education was drawn in *Tilton* v. *Richardson*, 403 U.S. 672 (1971), but this was not available under the more specific language of our anti-aid amendment. Hence the amendment of 1974. For further Supreme Court development of the distinction, see *Hunt* v. *McNair*, 413 U.S. 734 (1973); *Roemer* v. *Board of Pub. Works of Md.*, 426 U.S. 736 (1976); *Americans United for the Separation of Church & State* v. *Blanton*, 434 U.S. 803 (1977) (mem.).

[12] "No grant, appropriation or use of public money or property or loan of credit shall be made or authorized by the Commonwealth or any political subdivision thereof for the purpose of founding, maintaining or aiding any infirmary, hospital, institution, primary or secondary school, or charitable or religious undertaking which is not publicly owned and under the exclusive control, order and supervision of public officers or public agents authorized by the Commonwealth or federal authority or both, except that appropriations may be made for the maintenance and support of the Soldiers' Home in Massachusetts and for free public libraries in any city or town and to carry out legal obligations, if any, already entered into; and no such grant, appropriation or use of public money or property or loan of public credit shall be made or authorized for the purpose of founding, maintaining or aiding any church, religious denomination or society. Nothing herein contained shall be construed to prevent the Commonwealth from making grants-in-aid to private higher educational institutions or to students or parents or guardians of students attending such institutions."

gram of that order would be a use of public property for the purpose of aiding such schools in carrying out their essential function.

It is suggested, however, that the program envisaged by the statute is saved because possession of the books is (at least nominally) in the pupils rather than in the schools they attend. We believe the difference is without significance under the terms of our anti-aid amendment. For the stricture of our amendment is not limited to direct transfer of money or property from the government to the treasuries or possession of the schools. Rather it speaks of the "use" of public money or property for "maintaining or aiding" the schools. The textbook loan scheme of the challenged statute makes a "use" of public property, and the effect is to "aid" the schools, and in their very teaching function. To fall within the natural meaning of the constitutional prohibition the scheme need not necessarily replicate the features of a direct transfer; but as a matter of fact it does so substantially. Suppose the books had been turned over to the schools directly.[13] In that case the schools would distribute the books to their pupils. Portions of the books would be assigned for reading or for exercises within them, all as part of the class regimen. Teachers would develop the meaning of the books by classroom methods or exercises. The material would form the basis of examinations. But this is just the homely pattern of conduct that would be followed with the books provided under the statute.[14]

---

[13] Because the statute is attacked successfully on its face, we pass the point that the reality of the pupil's possession of the books is very questionable when one notes that the procedure adopted gives the private school a material role in the acquisition, distribution, and storage of the books. See *supra* at 37-38.

[14] In evaluating a statute very like ours, the Nebraska court said: "It seems to use that to state the constitutional provision is to answer our question. By its terms the provisions furnish aid (in the form of textbooks) to private sectarian schools. By its terms the cost is paid by a public appropriation of tax funds. By its terms textbooks must be used and are given in aid of students in educational institutions which are

The immaterality or unreality of the distinction proffered in defense of the statute is borne out by opinions of the Justices in the context of the anti-aid amendment itself. Legislation proposed in 1970 would have authorized the Commonwealth to reimburse private schools for part of the cost of their secular instruction—in effect, a partial subsidy. Because "[t]he language [of the amendment] unquestionably was designed to preclude entirely aid to all nonpublic institutions from appropriated public funds with minor exceptions not here relevant," the Justices found the plan impermissible and so informed the Senate. *Opinion of the Justices,* 357 Mass. 836, 844 (1970).[15] Shortly afterwards the House of Representatives sought advice about a plan to issue to the parents of private school pupils vouchers to be drawn on the Treasurer of the Commonwealth and to be used toward tuition payments. The Justices said: "The present bill seems to us to involve an indirect form of aid to nonpublic schools which, if enacted, would have in substance the same practical effect as the measure which we recently considered. We are of opinion that the present bill would violate § 2 of art. 46." *Opinion of the Justices,* 357 Mass. 846, 850 (1970). We may conclude here by noting that the Attorney General expresses his own dissatisfaction with the attempt to square the plain meaning and effect of the statute at bar with the constitutional provision.[16] But in

---

not exclusively owned and controlled by the state or a governmental subdivision thereof." *Gaffney* v. *State Dep't of Educ.,* 192 Neb. 358, 361-362 (1974).

[15] The Justices also remarked on "the explicit language of art. 46, § 2, of the Amendments, which is much more specific than that of the First Amendment," and on the "emphatic and comprehensive prohibition. . . found in the later part of § 2." *Id.* at 841, 842.

[16] Inconsistent with the text of the anti-aid amendment, the instant legislation is also inconsistent with its purposes (set out briefly above). The linkage of private and public curricula might, indeed, eventuate in pressure toward selection of books by the public authority acceptable to the private schools. Cf. *Committee for Pub. Educ. & Religious Liberty* v. *Nyquist,* 413 U.S. 756, 773 (1973); *Lemon* v. *Kurtzman,* 403

seeking to escape from this predicament, he recommends a reading of the statute which is merely fanciful, and which, even if accepted, would not appear to avoid the constitutional bar.[17]

4. *Discussion of Supreme Court cases.* As already intimated, there is no need for us to support our conclusion by entering upon the rather controversial decisional history under the vaguer no-establishment clause.[18] But we note, first, that the Supreme Court has been regularly unreceptive to schemes of circumvention which resemble that attempted by the present legislation; second, that the Supreme Court's book loan cases are themselves anomalous.

Holding unconstitutional the loan of instructional material and equipment (other than books), the Court found irrelevant that "the state legislature decided to channel the goods through the parents and pupils. Despite the technical change in legal bailee, the program in substance is the same as before: The equipment is substantially the same; it will receive the same use by the students; and it may still be stored and distributed on the nonpublic school premises." *Wolman* v. *Walter*, 433 U.S. 229, 250 (1977). A tuition reimbursement plan was similarly struck down in *Committee for Pub. Educ. & Religious Liberty* v. *Nyquist*, 413 U.S. 756 (1973): the fact that

U.S. 602, 612-613 (1971) (no-establishment clause prohibits excessive governmental entanglement with religion).

[17] The Attorney General states in his brief that he considers "constitutionally doubtful" and "cannot endorse ... as constitutionally reliable" a program for the public purchase of textbooks to be loaned to private school pupils. He suggests that we interpret G. L. c. 71, § 48, as requiring only the loan of those textbooks which unforeseeably remain after public school needs are met. We do not think the Legislature had that kind of scheme in mind; in any case, it might not remedy the statute's constitutional defect.

[18] For a recent return to the question, see Hearings on Various Tuition Tax Relief Bills before the Subcommittee on Taxation and Debt Management Generally of the Senate Committee on Finance, 95th Cong., 2d Sess. (1978).

the funds went to parents and students, not the schools, failed to legitimate the program. *Id.* at 781. And see *Lemon* v. *Kurtzman*, 403 U.S. 602, 614 (1971) (Court declines to join in "a legalistic minuet").

As the defendants point out, the Supreme Court has upheld loans of secular textbooks to parochial school students under the no-establishment clause. *Board of Educ. of Cent. School Dist. No. 1* v. *Allen*, 392 U.S. 236 (1968), followed in *Meek* v. *Pittinger*, 421 U.S. 349 (1975); *Wolman* v. *Walter*, *supra*.[19] (Our anti-aid amendment marks no difference between "aids," whether religious or secular.[20]) The Court, however, has strongly indicated that it is dissatisfied with its handiwork, which suggests that there might now be support for holding otherwise if the question were one of first impression. When the Court last year ruled out loans of various instructional materials and equipment, it recognized an inconsistency with its book loan cases: "There is, as there was in *Meek*, a tension between this result and *Board of Education* v. *Allen*, 392 U.S. 236 (1968) . . . . *Board of Education* v. *Allen* has remained law, and we now follow as a matter of *stare decisis* the principle that restriction of textbooks to those provided the public schools is sufficient to ensure that the books will not be used for religious purposes. In more recent cases, however, we have declined to extend that presumption of neutrality to other items in the lower

---

[19] See, for commentary, M. Howe, The Garden and The Wilderness (1965); Choper, The Establishment Clause and Aid to Parochial Schools, 56 Calif. L. Rev. 260, 313-318 (1968); Freund, Public Aid to Parochial Schools, 82 Harv. L. Rev. 1680 (1969); Note, Sectarian Books, the Supreme Court and the Establishment Clause, 79 Yale L.J. 111 (1969); Valente & Stanmeyer, Public Aid to Parochial Schools—A Reply to Professor Freund, 59 Geo. L.J. 59 (1970); Morgan, The Establishment Clause and Sectarian Schools: A Final Installment?, 1973 Sup. Ct. Rev. 57.

[20] As the Nebraska court said, "by its terms, the Constitution of Nebraska does not permit of an examination of secular or sectarian purposes." *Gaffney* v. *State Dep't of Educ.*, 192 Neb. 358, 362 (1974). See also note 14, *supra*.

school setting. . . . When faced, however, with a choice
between extension of the unique presumption created in
*Allen* and continued adherence to the principles an-
nounced in our subsequent cases, we choose the latter
course." *Wolman* v. *Walter, supra* at 251-252 n.18.

The *Allen* case indeed appears anomalous when consid-
ered against the sweep of Supreme Court cases concern-
ing aid to church-affiliated schools. In retrospect *Allen*
seems a false inference from *Everson* v. *Board of Educ. of
Ewing,* 330 U.S. 1 (1947), which validated as a general
safety measure a program for busing private as well as
public school children at State expense: it is noteworthy
that Mr. Justice Black, who wrote for a narrow majority
in *Everson,* dissented vigorously in *Allen.* Incompatible
with *Allen* is *Lemon* v. *Kurtzman, supra,* the case which
disallowed a plan for "purchase" of secular educational
services at private schools on the ground that this must
involve excessive "entanglement" of government with
religion—there was stress on the impossibility of distin-
guishing in practice the religious activities of the schools
from their secular endeavors which alone were supposed-
ly to be aided. *Id.* at 616-617. Inconsistent is *Wolman* v.
*Walter, supra,* so far as it held impermissible the furnish-
ing of bus rides for field trips, and the supply of instruc-
tional means such as maps and audio-visual aids, the
Court perceiving that any of these could be applied to
sectarian purposes. See also *Committee for Pub. Educ. &
Religious Liberty* v. *Nyquist,* 413 U.S. 756 (1973). Cf. *New
York* v. *Cathedral Academy,* 434 U.S. 125 (1977).

What the Court said about textbooks in *Norwood* v.
*Harrison,* 413 U.S. 455 (1973), also merits attention. The
case held that the loan by the State of textbooks to stu-
dents in racially exclusive private schools violated the
State's constitutional duty not to aid racial discrimina-
tion. (This is certainly not an issue in Massachusetts. See
note 6, *supra.*) With secularity irrelevant, the book loans
to pupils appeared identical with other substantial assis-
tance to the schools themselves: "This Court has consist-

ently affirmed decisions enjoining state tuition grants to students attending racially discriminatory private schools. A textbook lending program is not legally distinguishable from the forms of state assistance foreclosed by the prior cases. Free textbooks, like tuition grants directed to private school students, are a form of financial assistance inuring to the benefit of the private schools themselves. . . . Textbooks are a basic educational tool and, like tuition grants, they are provided only in connection with schools; they are to be distinguished from generalized services government might provide to schools in common with others [citations omitted]." 413 U.S. at 463-465.

5. *Limits of the present decision.* Our holding today that the questioned part of G. L. c. 71, § 48, is unconstitutional on its face does not imply any decision that sundry general benefits not entering into the educational process at elementary and secondary schools are also offensive to the Constitution.[21] As an example, and without now passing on the matter, we may note that provision of busing (G. L. c. 76, § 1) is distinct from a textbook program.[22] It might be enough to say, as the Supreme Court did in *Everson*, that busing is simply a community safety measure like police and fire protection; but even when the question is inquired into more closely, it is seen that the "aid" involved is quite remote: the pupil individually "consumes" the bus ride entirely; busing has no role in the teaching function, the school's essential enterprise; no technique of circumvention is involved; and there is no "entanglement" risk comparable to that involved in the selection of textbooks (see note 16, *supra*). The furnishing of health services (G. L. c. 71, § 57) seems comparable to

[21] In *Tilton* v. *Richardson*, 403 U.S. 672 (1971), and *Wilman* v. *Walter*, 433 U.S. 229 (1977), the Court upheld under the no-establishment clause the provision of a variety of educational and health diagnostic services to be enjoyed by all school pupils, as well as "neutral-site" remedial and therapeutic programs.

[22] The busing question was raised but not reached in *Quinn* v. *School Comm. of Plymouth,* 332 Mass. 410 (1955).

busing, and subsidized school meals may fall into the same category.[23] (G. L. c. 71, § 72. St. 1948, c. 548, § 12, as appearing in St. 1970, c. 871, § 4.) Exemptions from property taxation accorded to schools (G. L. c. 59, § 5) entail no "grant, appropriation or use" of public money within the meaning of the anti-aid amendment, as was made clear at the 1917 convention. See 1 Debates in the Massachusetts Constitutional Convention, 1917-1918, at 361 (1919); R.L. Bridgman, The Massachusetts Constitutional Convention of 1917, at 34 (1923); *Massachusetts Soc. for the Prevention of Cruelty to Animals* v. *Commissioner of Pub. Health*, 339 Mass. 216, 229-230 (1959); *Worcester* v. *New England Inst. & New England School of Accounting, Inc.*, 335 Mass. 486, 490 (1957); *Walz* v. *Tax Comm'n*, 397 U.S. 664, 671-672 (1970).[24]

6. *Conclusion.* We recognize the difficulties of the textbook loan issue. Its proper resolution under the First Amendment has given the Supreme Court much trouble, evidenced by its ambivalent attitude toward the *Allen* decision. The resolution of the question under varying State Constitutions has divided the State courts among and within themselves.[25] More generally, we are aware of

---

[23] Other statutory contacts between the public and private education sectors: A school committee may contract with private schools to provide for children with special educational needs (G. L. c. 71B, §§ 4, 10, 13). See also the general provision that a school committee shall allow religious, educational, and other associations use of public school premises "as it deems for the interest of the community." G. L. c. 71, § 71.

[24] Similarly no "grant, appropriation or use" of public money or property was involved in the scheme for an Educational Facilities Authority to facilitate arrangements for the construction and financing of projects of higher educational institutions. *Opinion of the Justices*, 354 Mass. 779, 784 (1968).

[25] Cases decided under a variety of State constitutional provisions have ruled on the permissibility of free busing and textbook loans, with a diversity of result. Book loans were held unconstitutional in Michigan, *Advisory Opinion re Constitutionality of 1974 PA 242*, 394 Mich. 41 (1974); Missouri, *Paster* v. *Tussey*, 512 S.W.2d 97, 104 (1974), cert. denied sub nom. *Reynolds* v. *Paster*, 419 U.S. 1111 (1975); Nebras-

the conflicting arguments of policy brought to bear on the issue of assistance to private education, and we acknowledge the weight of the argument that centers on the im-

ka, *Gaffney* v. *State Dep't of Educ.*, 192 Neb. 358 (1974); Oregon, *Dickman* v. *School Dist. No. 62C*, 232 Or. 238 (1961), cert. denied sub nom. *Carlson* v. *Dickman*, 371 U.S. 823 (1962); and South Dakota, *McDonald* v. *School Bd. of Yankton*,      S.D.      (1976) (246 N.W.2d 93 [1976]). (*People ex rel. Klinger* v. *Howlett*, 56 Ill. 2d 1 [1973]), also held such loans unconstitutional but on a special basis.)

Several other State Supreme Courts have upheld such loans: New York, *Board of Educ. of Cent. School Dist. No. 1* v. *Allen*, 20 N.Y.2d 109 (1967) (affirmed by the Supreme Court in *Allen*); Louisiana and Mississippi in two older cases, *Borden* v. *Louisiana State Bd. of Educ.* 168 La. 1005 (1928), aff'd sub nom. *Cochran* v. *Louisiana State Bd. of Educ.*, 281 U.S. 370 (1930), and *Chance* v. *Mississippi State Textbook Rating & Purchasing Bd.*, 190 Miss. 453 (1941); Rhode Island under a constitutional provision far less explicit than ours, *Bowerman* v. *O'Connor*, 104 R.I. 519 (1968); and New Hampshire in a decision, *Opinion of the Justices*, 109 N.H. 578 (1969), construing the State amendment in pari materia with the Federal First Amendment and predating the Court's questioning of *Allen* in *Wolman* v. *Walter, supra*.

Many courts have found that their State Constitutions do not permit even the busing of school children which the Court countenanced in 1947 with *Everson: Matthews* v. *Quinton*, 362 P.2d 932 (Alas. 1961), appeal dismissed, 368 U.S. 517 (1962); *State* v. *Brown*, 36 Del. 181 (1934); *Spears* v. *Honda*, 51 Haw. 103 (1969); *Epeldi* v. *Engelking*, 94 Idaho 390 (1971), cert. denied, 406 U.S. 957 (1972); *Judd* v. *Board of Educ. of Union Free School Dist. No. 2 of Hempstead*, 278 N.Y. 200 (1938) (but disapproved in *Board of Educ. of Cent. School Dist. No. 1* v. *Allen, supra*); *Board of Educ. for Independent School Dist. No. 52* v. *Antone*, 384 P.2d 911 (Okla. 1963); *Visser* v. *Nooksack Valley School Dist. No. 506*, 33 Wash. 2d 699 (1949); *State ex rel. Reynolds* v. *Nusbaum*, 17 Wis. 2d 148 (1962).

Allowing busing programs are: *Bowker* v. *Baker*, 73 Cal. App. 2d 653 (1946); *Snyder* v. *Newtown*, 147 Conn. 374 (1960); *Board of Educ.* v. *Bakalis*, 54 Ill. 2d 448 (1973); *Nichols* v. *Henry*, 301 Ky. 434 (1945); *Americans United Inc.* v. *Independent School Dist. No. 622*, 288 Minn. 196 (1970); *Honohan* v. *Holt*, 17 Ohio Misc. 57 (C.P. 1968); *Rhoades* v. *School Dist. of Abington Township*, 424 Pa. 202, appeal dismissed, 389 U.S. 11 (1967); *State ex rel. Hughes* v. *Board of Educ. of Kanawha*, 154 W. Va. 107 (1970), cert. denied, 403 U.S. 944 (1971).

For discussion of the assortment of State cases, see Duval, The Constitutionality of State Aid to Nonpublic Elementary and Secondary Schools, 1970 U. Ill. L.F. 342, 366-377; Note, Public Funds for Sectarian Schools, 60 Harv. L. Rev. 793 (1947); Note, Catholic Schools and Public Money, 50 Yale L.J. 917 (1941); Annot., 93 A.L.R.2d 986 (1964).

portance of nonpublic schools for the promotion of social pluralism and encouragement of experimentation in educational method. We acknowledge, too, that for some the choice of a religious school for children is a matter of conscience, and yet under present conditions may be out of reach for economic reasons. But for this Commonwealth, the counter arguments have prevailed to the extent of an anti-aid amendment, and we do not think any plausible interpretation of it could tolerate the particular legislation under review. If there is to be a relaxation of the State's present limitations on public aid to private education, it is fitting that the voters of the Commonwealth should command it, as they have done before.

The judgment appealed from is reversed, and a judgment will enter enjoining the enforcement of the second paragraph of G. L. c. 71, § 48.[26]

*So ordered.*

---

[26] Particularly in light of the agreed statement under Mass. R. A. P. 8 (d), see note 4, *supra*, there is no occasion, upon reversing the judgment, to grant the defendant leave to plead over.