488 P.2d 860

**Mr. and Mrs. Louis EPELDI, husband and wife et al., Plaintiffs-Respondents,**

v.

**D. F. ENGELKING, as Superintendent of Public Instruction et al., Defendants-Appellants.**

No. 10796.

Supreme Court of Idaho.

Sept. 1, 1971.

Rehearing Denied Sept. 27, 1971.

Robert M. Robson, Atty. Gen. (at time of briefing), W. Anthony Park, Atty. Gen. (at time of argument) and James G. Hargis, Asst. Atty. Gen., Boise, for defendants-appellants.

Hawley, Troxell, Ennis & Hawley, Boise, and Philip E. Peterson, Lewiston, for plaintiffs-respondents.

McFADDEN, Justice.

The plaintiffs (respondents on this appeal) instituted this class action on their own behalf and on behalf of all parents of school children and the children themselves attending parochial schools in Idaho.

By this action the plaintiffs seek a declaratory judgment that allocation by defendants (appellants herein) of state funds to the several school districts pursuant to I.C. § 33–1501 as amended, S.L.1970, Ch. 91, § 1,[1] for the purpose of transportation of the parochial students is constitutional.

The defendants, the State Superintendent of Public Instruction and the members of the State Board of Education, admitted most of the factual allegations of the plaintiffs' complaint, and the cause was submitted to the trial court on a stipulated set of facts. The trial court rendered a memorandum opinion, findings of fact and conclusions of law, upholding the constitutionality of the statute in question, and entered judgment accordingly. This appeal followed.

It was stipulated, and the trial court found, that the appellants have indicated by letter their intent to refuse to allocate moneys for the foundation program of the local school districts to be used to transport children to parochial schools; that there are approximately 5,000 students attending parochial schools throughout the state with about 1,000 students qualifying to be counted in the transportation formula calculations; that I.C. § 33–1501 as amended, permitted the transportation of students to private schools and that the State Board of Education has refused to spend tax moneys for this purpose by reason that such expenditures are contrary to Idaho Const. art. 9, § 5; that many of the students attending parochial schools are riding school buses furnished by the parents of the children, which buses are inferior in condition and maintenance to the school district buses; that many of the children not riding buses to the parochial schools must seek their own methods of transportation, or walk long distances to school upon roads not having sidewalks, or are required to ride bicycles on crowded streets. It was further stipulated that all of the parochial schools are duly certified

1. "Chapter 91
AN ACT
AMENDING SECTION 33–1501, IDAHO CODE, RELATING TO TRANSPORTATION OF PUPILS, BY PROVIDING FOR THE TRANSPORTATION OF BOTH PUBLIC AND PRIVATE SCHOOL PUPILS WITHIN THE SCHOOL DISTRICT.
Be It Enacted by the Legislature of the State of Idaho:
SECTION 1. That Section 33–1501, Idaho Code, be, and the same is hereby amended to read as follows:
33–1501. TRANSPORTATION AUTHORIZED.—To afford more equal opportunity for public school attendance, the board of trustees of each district, including specially chartered school districts, shall, where practicable, provide transportation for the public [and private] school pupils of [within] the district, under conditions and limitations herein set forth. In approving the routing of any school bus or other passenger equipment, or in the maintenance and operation of all such transportation equipment, or in the appointment or employment of chauffeurs, the primary requirements to be observed by the board of trustees are the safety and adequate protection of the health of the pupils. Nothing herein contained shall prevent any board of trust-

ees from denying transportation to any pupil in any school bus or other transportation equipment operated by or under the authority of said board, upon good cause being given, in writing, to the parents or guardian, or either of them, of such pupil.
No board of trustees shall be required to provide transportation for any pupil living less than one and one-half (1½) miles from the nearest appropriate school. That distance shall be determined by the nearest and best route from the junction of the driveway of the pupil's home and the nearest public road, to the nearest door of the schoolhouse he attends, or to the bus stop, as the case may be. The board may transport any pupil a lesser distance when in its judgment the age or health or safety of the pupil warrants.
To effectuate the public policy hereby declared, the board of trustees of any school district may purchase or lease, and maintain and operate school buses and other passenger equipment; may enter into contracts with individuals, firms, corporations or private carriers; or may make payments to parents or guardians, subject to the limitations herein provided, when transportation is not furnished by the district." (Emphasis indicates amendment).

and inspected as accredited schools in the State of Idaho and all of the teachers teaching in the schools are certified and accredited by the State of Idaho; that all of the schools derive their support from the parishes in which they are located and any tuition paid by the child is incidental.

The appellants assert the trial court was in error in concluding and holding that the allocation of state tax money to meet extra costs incurred for the transportation of children attending schools operated by religious organizations does not violate the provisions of art. 9, § 5, of the Idaho Constitution.[2] Correlative to that assertion, the appellants further argue that the trial court erred in holding that the various school districts in the state and appellants herein may expend tax money for the transportation of children attending parochial schools.

The trial court primarily relied on two decisions of the United States Supreme Court in arriving at its conclusion that this particular statute did not contravene the provisions of art. 9, § 5. From School Dist. of Abington Township, Pa. v. Schempp, 374 U.S. 203 at 222, 83 S.Ct. 1560 at 1571, 10 L.Ed.2d 844 at 858 (1963), the trial court quoted in its memorandum decision:

"* * * The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

The trial court further quoted the following language from Board of Education of Central School Dist. No. 1 v. Allen, 392 U.S. 236 at 242, 88 S.Ct. 1923 at 1926, 20 L.Ed.2d 1060 at 1065 (1968):

"* * * The statute was held to be valid even though one of its results was that 'children are helped to get to church schools' and 'some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets.' [Citation.] As with public provision of police and fire protection, sewage facilities, and streets and sidewalks, payment of bus fares was of some value to the religious school, but was nevertheless not such support of a religious institution as to be a prohibited establishment of religion within the meaning of the First Amendment." (Referring to Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), discussed infra).

Applying the tests of these two opinions, the trial court reasoned that

"[a] reading of the statute, as amended, clearly indicates that the purpose of the statute is a secular legislative purpose, that is, to provide all children in the state with the same right of bus service to the school of their choice. The bus service will be controlled by the public school district. The money will be expended by them. Thus it appears that the sole purpose of the legislation is to provide fair and adequate means of transportation for all children of the state whether they attend public or pri-

2. "Art. 9, § 5. Sectarian appropriations prohibited.—Neither the legislature nor any county, city, town, township, school district, or other public corporation, shall ever make any appropriation, or pay from any public fund or moneys whatever, anything in aid of any church or sectarian or religious society, or for any sectarian or religious purpose, or to help support or sustain any school, academy, seminary, college, university or other literary or scientific institution, controlled by any church, sectarian or religious denomination whatsoever; nor shall any grant or donation of land, money or other personal property ever be made by the state, or any such public corporation, to any church or for any sectarian or religious purpose."

vate schools, and the benefits, if any, to the private schools are incidental."

The trial court related these opinions of the United States Supreme Court to the issue presented by the statute in question when considered in light of Idaho Const. art. 9, § 5, and determined that under the tests of those cases, the statute did not contravene the prohibitions of the Idaho Constitution.

It is appellants' position that the Idaho constitutional provision is more restrictive than the First Amendment of the United States Constitution[3] and that the trial court improperly relied on the tests set forth in School Dist. v. Schempp and in Board of Education v. Allen, both supra. In support of this position, the appellants rely on a line of authorities exemplified by Matthews v. Quinton, 362 P.2d 932 (Alaska 1961); Visser v. Nooksack Valley School Dist. No. 506, 33 Wash.2d 699, 207 P.2d 198 (1949); and Judd v. Board of Education, 278 N.Y. 200, 15 N.E.2d 576, 118 A.L.R. 789 (1938).[4]

In Matthews v. Quinton, supra, the Supreme Court of Alaska was concerned with validity of a statute authorizing transportation of students attending non-public schools in light of its constitutional prohibition that "[n]o money shall be paid from public funds for the direct benefit of any religious or other private educational institution." Alaska Const. art. VII, § 1. That court held that the furnishing of transportation to students attending non-public schools at public expense was a *direct benefit to the school* and the statute

unconstitutional. Therein that court relied on the dissent of Justice Rutledge in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and on other state court opinions, including Visser v. Nooksack Valley School Dist., supra.

Following the reasoning in Matthews v. Quinton, supra, the Hawaiian Supreme Court, in Spears v. Honda, 51 Haw. 1, 449 P.2d 130 (1969), also held that a statute authorizing use of public funds to provide bus transportation subsidies to sectarian and private school students was contrary to the provisions of its constitution, which stated, "Nor shall public funds be appropriated for the support or benefit of any sectarian or private educational institution."

Visser v. Nooksack Valley School Dist. No. 506, supra, involved Washington Const. art. 1, § 11, which provides " * * * No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or the support of any religious establishment. * * *." Therein the Washington court held that following its earlier decision in Mitchell v. Consolidated School Dist. No. 201, 17 Wash.2d 61, 135 P.2d 79, 146 A.L.R. 612 (1943), the statute authorizing "All children attending school in accordance with the laws relating to compulsory attendance in the State of Washington shall be entitled to use the transportation facilities provided by the school district in which they reside" was unconstitutional. The *Visser* opinion reiterated the statement in Judd v. Board of Education, 278 N.Y. 200,

3. U.S.Const. Amend 1. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

4. School transportation cases decided on a constitutional level which also support appellant are: Opinion of the Justices, 216 A.2d 668 (Del.1966), following State ex rel. Traub v. Brown, 6 W.W.Harr.

181, 172 A. 835 (Del.Superior Ct., 1934); State ex rel. Van Straten v. Milquet, 180 Wis. 109, 192 N.W. 392 (1923); State ex rel. Reynolds v. Nusbaum, 17 Wis.2d 148, 115 N.W.2d 761 (1962); and Board of Education for Ind. School Dist. No. 52 v. Antone, 384 P.2d 911 (Okl.1963). Further, on related matters, see: Swart v. South Burlington Town School Dist., 122 Vt. 177, 167 A.2d 514 (1961); Opinion of the Justices, 108 N.H. 268, 233 A.2d 832 (1967); Opinion of the Justices, 261 A.2d 58 (Maine 1970).

15 N.E.2d 576, 118 A.L.R. 789, as previously quoted in the *Mitchell* case, that "* * * [t]he argument is advanced that furnishing transportation to the pupils of private or parochial schools is not in aid or support of the schools within the spirit or meaning of our organic law but, rather, is in aid of their pupils. That argument is utterly without substance. * * * Free transportation of pupils induces attendance at the school. The purpose of the transportation is to promote the interests of the private school or religious or sectarian institution that controls and directs it. * * *." 207 P.2d at 203.

As opposed to these authorities, the respondents call our attention to a series of cases which hold that the furnishing of transportation to students attending private or parochial schools does not transcend either the state or federal constitutional provisions dealing with the separation between the state and religious sector of our society. Generally this other line of cases is reasoned from the premise that the transportation is being furnished to the children and not to the institution and hence does not constitute any aid or benefit to the sectarian institution. Certain authorities have termed this theory as the "child benefit" theory, and cases that have adopted this theory in resolution of the constitutional problem include: Rhoades v. School Dist. of Abington Township, 424 Pa. 202, 226 A.2d 53 (1967); Snyder v. Town of Newtown, 147 Conn. 374, 161 A.2d 770 (1961); Bowker v. Baker, 73 Cal.App. 2d 653, 167 P.2d 256 (1946); Adams v. County Com'rs of St. Mary's County, 180 Md. 550, 26 A.2d 377 (1942); Alexander v. Bartlett, 14 Mich.App. 177, 165 N.W. 2d 445 (1968); Americans United Inc. etc., et al. v. Independent School Dist. No. 622, 288 Minn. 196, 179 N.W.2d 146 (1970).

The leading case employing the child benefit theory is Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).[5] Therein the Supreme Court of the United States, in considering the First Amendment to the Constitution of the United States stated:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another * * *. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." 330 U.S. at 15–16, 67 S.Ct. at 511–512, 91 L.Ed. at 723.

The court continued in considering whether payments under a New Jersey statute to parents for transportation of their children to parochial schools was constitutionally permissible, and then stated:

"That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them * * *. The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." 330 U.S. at 18, 67 S.Ct. at 513, 91 L.Ed. at 724–725.

In Board of Education v. Allen, 392 U.S. 236 at 243, 88 S.Ct. 1923 at 1926, 20 L.Ed. 2d 1060 at 1065 (1968), the Supreme Court of the United States, in a case involving

---

5. The progenitor of the child benefit theory is Cochran v. Louisiana State Bd. of Education, 168 La. 1030, 123 So. 664 (1929), aff'd 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930). The First Amendment issue was not raised in the appeal to the United States Supreme Court.

a state supported textbook program in New York, stated:

"The test may be stated as follows: what are the purpose and primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

The constitutional validity of the type of legislation now before this court has been a fertile field for litigation and consideration and discussion by innumerable legal authors.[6]

Consideration of the numerous cases cited by both parties leads to only a partial answer to the problem before this court. It is clear under Everson v. Board of Education, supra, that furnishing public funds to parents of students attending parochial schools to aid the students in attendance at those schools is not prohibited by the First Amendment of the United States Constitution. Board of Education v. Allen, supra, holds that the furnishing of secular textbooks by school authorities for use by students in parochial schools, likewise is not contrary to the First Amendment.

However, unlike the provisions of the Federal Constitution, the Idaho Constitution contains provisions specifically focusing on private schools controlled by sectarian, religious authorities. In considering the provisions of Idaho Const. art. 9, § 5, set out above, one cannot help but first be impressed by the restrictive language contained therein.

█ This section in explicit terms prohibits any appropriation by the legislature or others (county, city, etc.) or payment from any public fund, *anything in aid* of any church or to help support or sustain any sectarian school, etc. By the phraseology and diction of this provision it is our conclusion that the framers of our constitution intended to more positively enunciate the separation between church and state than did the framers of the United States Constitution. Had that not been their intention there would have been no need for this particular provision, because under Idaho Const. art. 1, § 3, the exercise and enjoyment of religious faith was guaranteed (comparable to the free exercise of religion guaranteed by the First Amendment of the United States Constitution) and it further provides no person could be required to *attend* religious services or *support* any particular religion, or pay tithes against his consent (comparable to the establishment clause of the First Amendment).

The Idaho Const. art. 9, § 5, requires this court to focus its attention on the legislation involved to determine whether it is in "aid of any church" and whether it is "to help support or sustain" any church affiliated school. The requirements of this constitutional provision thus eliminate as

---

6. See: Note: "Catholic Schools and Public Money," 50 Yale Law Journal 917 (1941); William J. McKenna, "The Transportation of Private and Parochial School Children at Public Expense," 35 Temple Law Quarterly 259 (1962); Jesse H. Choper, "The Establishment Clause and Aid to Parochial Schools," 56 Cal. Law Review 260 (1968); Note: "Aid to Church Related Education—New Directions Without Dogma" 55 Virginia Law Review 579 (1969); Paul A. Freund, "Public Aid to Parochial Schools," 82 Harvard Law Review 1680 (1969): Note: "Public Funds for Sectarian Schools," 60 Harvard Law Review 793 (1947); Note:

"Constitutional Law—Aid to Parochial Schools and the Establishment Clause—Everson to Allen: From Buses to Books and Beyond," 18 De Paul Law Review 785 (1969); Comment: "Shared Time—Permissible Aid to Sectarian Education," 17 De Paul Law Review 373 (1968); Dean Robert F. Drinan, "Implications of the Allen Textbook Decision," 14 Catholic Lawyer 285 (See especially p. 288 through p. 290); John N. Moore, "The Supreme Court and the Relationship Between the 'Establishment' and 'Free Exercise' Clauses," 42 Texas Law Review 142 (1963).

a test for determination of the constitutionality of the statute, both the "child benefit" theory discussed in Everson v. Board, supra, and the standard of Board of Education v. Allen, supra, i. e., whether the legislation has a "secular legislative purpose and a primary effect that neither advances nor inhibits religion." In this context, while we recognize that even though this legislation does assist the students to attend parochial schools, it also aids those schools by bringing to them those very students for whom the parochial schools were established. Thus, it is our conclusion that this legislation, the effect of which would be to aid the school, is prohibited under the provisions of Idaho Const. art. 9, § 5.

■ There remains one further issue for consideration. The respondents assert that denial to the students of the right to ride the public buses would be in violation of the equal protection clause of the Fourteenth Amendment of the Constitution of the United States. Respondents in support of this contention rely upon the case of State ex rel. Hughes v. Board of Education, 174 S.E.2d 711 (W.Va.1970). In that case the West Virginia Supreme Court of Appeals stated:

"When a county board of education has provided a system for the transportation of school children by bus, pursuant to the provisions of Code, 1931, 18-5-13(6), as amended, the refusal of the county board of education to provide such transportation to certain children of the county, merely because they attend a Catholic parochial school, denies to such children and their parents the equal protection of the laws which is guaranteed by the Fourteenth Amendment of the Constitution of the United States and also denies to such children and their parents their right to religious freedom guaranteed by the First Amendment of the Constitution of the United States and by Section 15 of Article III of the Constitution of West Virginia." 174 S.E.2d at 712 (Syllabus, para. 2).

"* * * We are of the opinion, therefore, that, in these two cases, a denial to parochial school children of all right to the benefit of the facilities of transportation on buses, maintained and operated for the transportation of public school children by the respective county boards of education, denies to the Catholic parochial school children and their parents the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution of the United States." 174 S.E.2d at 718–719.

That court continued and pointed out denial to children attending parochial schools of equal rights to bus transportation deprives those children and their parents of their right to religious freedom.

■ With this conclusion we disagree. The Fourteenth Amendment of the United States Constitution guarantees equal protection of the laws. The school buses are operated for the students attending public schools, and if the parochial students desire to avail themselves of these buses they could do so by attending the public school. Respondents assert however that this is no answer, because if that is the case, then they would be deprived of their right to freedom of religion, in effect, saying that denying them the right to ride the public school bus forces them to forego their right to parochial schooling, contrary to the First Amendment. This argument in our minds is a circuitous route to arrive at a predetermined goal. If the students attending parochial schools do not have a constitutional right to compel the school authorities to furnish them transportation to their parochial school, how can it be said they are then deprived of their right to exercise religious freedom, when solely by reason of their exercise of this freedom, i. e. their attendance at parochial school, they have removed themselves from the right to enjoy these benefits.

The question of whether a state, in light of federal standards relative to free exercise of religion, may yet deny aid to all parochial students because of the state's

anti-establishment policy is relatively novel. Respondents refer to State ex rel. Hughes v. Board of Education, supra, for the proposition that Idaho must furnish busing. The West Virginia Supreme Court of Appeals, however, did not rule that busing of parochial students was forbidden by that state's policy against aiding religious institutions. Thus, their resolution of the issue was not necessary to the ultimate ruling.

It appears from Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), that a state may not limit a citizen's acceptance of public welfare benefits on his foregoing a practice or precept of his religion unless the state can show a paramount interest. 374 U.S. at 406, 83 S.Ct. at 1795, 10 L.Ed.2d at 972.

In *Sherbert* no paramount interest was demonstrated. In Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), the Supreme Court applied the same test in a Sunday closing law case and did find a sufficient state interest. In the case at hand there is a fundamental state policy at stake directly relating to one area of freedom of religion which seems to conflict with another area, i. e. the establishment prohibition versus free exercise. The apparent conflict can be resolved; busing benefits are denied to all students who attend religious schools and this is the Idaho Constitution's price for exercising one's religious beliefs. Under the present constitutional structure the state has no alternative method by which it can implement the fundamental policy against aiding religion unless such aid in the form of busing is proscribed.

■ It seems the Supreme Court was aware of this issue in the *Everson* case. The majority opinion states:

"New Jersey cannot consistently with the 'establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church. On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Nonbelievers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation. While we do not mean to intimate that a state could not provide transportation only to children attending public schools, we must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general State law benefits to all its citizens without regard to their religious belief." 330 U.S. at 16, 67 S.Ct. at 512, 91 L.Ed. at 724.

This passage adds weight to our conclusion that a state has sufficient latitude under the Fourteenth and First Amendments to uphold its policy against aid to religion although by doing so free exercise of religion (attending parochial schools) becomes more expensive.[7]

This court in considering this case is cognizant of the desire of the legislature

---

7. The Washington Supreme Court in Visser v. Nooksack Valley School Dist. No. 506, supra, commented on this same passage from *Everson*, as follows:

"Appellants have placed great reliance on the principles announced in Everson v. Board of Education * * *. While that case holds, on its facts, that the incidental furnishing of free public transportation to parochial schools is not an 'establishment of religion,' within the prohibition of the First Amendment to the United States constitution, neverthe-

less the right of the individual states to limit such public transportation to children attending the public schools is carefully preserved. * * *." 207 P.2d at 204.

"Appellants * * * [urge] that rights under the First Amendment to the Federal constitution are at stake if the transportation they seek is denied them. The Everson case, itself, is a clear answer to that contention. * * *." 207 P.2d at 205.

to aid and assist the plight of the parochial schools which nationally are faced with all the financial problems of the public schools. While the legislative goal to aid all students in obtaining an education is commendable, nonetheless, the constitution of this state in explicit terms has declared that public aid of churches and church schools is prohibited. This provision has been a part of our constitution and a part of the article pertaining to education since statehood. If it be the desire of the citizens of this state that such aid should be given to the parochial or private schools of this state, it is our conclusion that the proper approach is to submit the issue to the electorate by a constitutional amendment, as occurred in the State of New York, following the decision of that state's highest court in the case of Judd v. Board of Education, 278 N.Y. 200, 15 N.E.2d 576, 118 A.L.R. 798 (1938).[8]

■ It is our conviction that the constitutional prohibition of article 9, § 5, prohibits the furnishing of state aid to the parochial schools in the form of transportation by the district school buses of the students of the parochial schools. Thus, the judgment of the trial court is reversed. Costs to appellants.

SHEPARD and SPEAR, JJ., concur.

McQUADE, Chief Justice, dissenting; and, DONALDSON, Justice, concurs in the dissent.

I am forced to disagree with the majority on four essential grounds. First, it is my strong conviction that the majority opinion represents a serious encroachment by the judicial branch of government into an area heretofore reserved, both by the Idaho Constitution and previous opinions of this Court, to the legislative branch.

The majority has, *sua sponte,* usurped the legislative function and characterized I.C. § 33–1501 as "religious." Such a judicial characterization completely ignores the legislative statement contained in the enactment that I.C. § 33–1501 is a declaration of public policy, the primary requirements of which are the safety, protection and health of the pupils. The expressed purpose of the statute is to provide transportation for the public and private school pupils within the school districts.

This Court has held that the power to make and determine policy for the government of the state is vested in the legislature.[1] In 1970 the Idaho legislature amended I.C. § 33–1501, which establishes the formula for allocation of state monies for busing of school children, by inserting the words "and private" between the words "public" and "school pupils." The legislature's intent was to extend the benefits of that statute and the state monies thus expended to all school children whether public or private. I.C. § 33–1501 by its terms is of statewide application and operates uniformly upon all members of a proper legislative classification which encompasses all school children attending public and private schools, whether sectarian or non-sectarian, within districts which are now or hereafter eligible to receive state-aid for transportation under I.C. § 33–1501.

This Court presumes legislation to be constitutional and will seek to sustain rather than invalidate legislative action where it is open to interpretation.[2] It is my belief that one must necessarily conclude that the legislature has constitutionally exercised its policy making power in this case. This and not "religion" is the primary issue in this case. Children attending private schools whether sectarian

---

8. Other courts have suggested this approach to properly settle the matter. See Americans United Inc., etc., et al. v. Indep. School Dist. No. 622, 288 Minn. 196, 179 N.W.2d 146 at 157 (1970), and Spears v. Honda, 51 Haw. 1, 449 P.2d 130 at 138–139 (1969).

1. Rich v. Williams, 81 Idaho 311, 341 P.2d 432 (1959).

2. State v. Peterson, 61 Idaho 50, 97 P.2d 603 (1939); Idaho Gold Dredging Co. v. Balderston, 58 Idaho 692, 78 P.2d 105 (1938).

or non-sectarian are to be afforded the opportunity to ride public schools buses. It is clear from the enactment itself that the expenditure is not for the benefit of the school, that it is not designed to support the school, but instead is intended, as clearly stated in the statute, to provide for the safety of children attending school, whatever that school might be. The legislature has simply concluded that private school children are as susceptible to the dangers of traffic as are the public school students.

The emphasis by the majority on the issue of religion seems, at best, misplaced. The legislation is directed towards public and private school children. A certain percentage of private school children happen to be children who attend parochial schools. But the contested part of the legislation is much broader and of wider application than a reading of the majority opinion would lead one to believe, *i. e.,* it extends to all private school children, whether sectarian or non-sectarian. The "religious" issue seems to be more fabricated than real and it is unfortunate that the majority has accepted and even further expanded the original distortion of the issue propounded by the appellants. As a result, I must extend my disagreement with the majority to a discussion of the religious issues that have been developed in the majority opinion.

The second and third grounds for my dissent are that the denial of busing for the reasons stated in the majority opinion violates the Equal Protection Clause of the Fourteenth Amendment as well as the Free Exercise Clause of the First Amendment of the U.S. Constitution. Although the landmark case of Everson v. Board of Education [3] was not decided on equal protection grounds, there is an indication of how the U.S. Supreme Court regarded this issue in a free exercise context:

"[New Jersey] cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation. * * * [W]e must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general State law benefits to all its citizens without regard to their religious belief." (Emphasis theirs).[4]

Pierce v. Society of Sisters,[5] established the constitutional right of a parent to send his child to parochial schools and denied to the state the right to prohibit the operation of those schools and child attendance at them. This principle has been embodied by our legislature in I.C. § 33-202 which also compels all children in Idaho to attend approved schools:

"The parent or guardian of any child resident in this state who has attained the age of seven (7) years at the time of the commencement of school in his district, but not the age of sixteen (16) years, shall cause the child to be instructed in subjects commonly and usually taught in the public schools of the state of Idaho. Unless the child is otherwise comparably instructed, as may be determined by the board of trustees of .the school district in which the child resides, the parent or guardian shall cause the child to attend a public, private or parochial school during a period in each year equal to that in which the public schools are in session; there to conform to the attendance policies and regulations established by the board of trustees, or other governing body, operating the school attended."

---

3. 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

4. Everson v. Board of Education, 330 U.S. at 16, 67 S.Ct. 512, 91 L.Ed. at 724.

5. 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

The parochial schools referred to are certified by the State Board of Education. The parents of parochial as well as private school children are required to pay the same amount of tax to support the public school system as do public school parents. To deny to parochial school children the benefit of transportation because of the fact they choose to attend a parochial school denies them Equal Protection. The denial by such a classification is unreasonable. There is nothing idealogical, sectarian or religious about a bus. All children should share the benefits of public transportation. The transportation should be provided the student, not because he attends a certain school but because he is a child within a certain classification properly created by the legislature.

A recent decision by the Supreme Court of Appeals of West Virginia is very relevant to the case at bar. That case involved the same issue as the case at bar except that in West Virginia only Catholic students were involved, where in Idaho all private school children are involved making the West Virginia Court's reasoning even more applicable *a fortiori*. The West Virginia Court stated:

"When a county board of education has provided a system for the transportation of school children by a bus, pursuant to the provisions of Code, 1931, 18–5–13(6), as amended, the refusal of the county board of education to provide such transportation to certain children of the county, merely because they attend a Catholic parochial school, denies to such children and their parents the equal protection of the law which is guaranteed by the Fourteenth Amendment of the Constitution of the United States and also denies to such children and their parents their right to religious freedom guaranteed by the First Amendment of the Constitution of the United States * * *." [6]

In West Virginia, as in Idaho, children under a certain age are compelled to attend state accredited schools whether that be private or parochial. The West Virginia Supreme Court went on to say:

"School buses owned and operated by county boards of education are, in a great measure at least, maintained and operated in order to protect the health, safety and welfare of the students who are transported thereon. Numerous statutes and traffic regulations are designed to afford a special degree of safety to children transported on public school buses. The buses protect the children from all sorts of inclement weather, including rain, snow and sleet. By the system of bus transportation maintained by county boards of education, children are protected, in a great measure, from many of the dangers incident in this day, to travel on public streets, sidewalks and highways arising from vehicular traffic hazards and from molestation, personal violence, kidnapping or other harm of a criminal character. We are of the opinion, therefore, that, in these two cases, a denial to parochial school children of all right to the benefit of the facilities of transportation on buses, maintained and operated for the transportation of public school children by the respective county boards of education, denies to the Catholic parochial school children and their parents the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution of the United States." [7]

Regarding the companion issue of free exercise, the West Virginia Court stated that:

"It is quite true that a Catholic child clearly would be afforded school bus transportation by the mere expedient of electing to attend a public school. We are of the opinion, however, that the denial to children attending Catholic parochial schools of equal rights of bus transportation accorded to children attending

---

6. State ex rel. Hughes v. Board of Education, 174 S.E.2d 711, 712 (syllabus by the Court, paragraph 2) (W.Va.1970).

7. 174 S.E.2d 711, 718–719.

public schools deprives Catholic children and their parents of their right of religious freedom in violation of the provisions of the First Amendment of the Constitution of the United States * * *." [8]

In the case of Sherbert v. Verner,[9] the U.S. Supreme Court held that a state may not limit a citizen's acceptance of public welfare benefits to his foregoing a practice or precept of his religion unless the state could show a paramount interest. In *Sherbert* no paramount or overriding state interest was established. The majority in the case at bar, however, contends that the intended private school recipients, among whom there are some parochial school students, of the public welfare legislation of busing must forgeo this benefit since the estate has a paramount interest in prohibiting establishment of religion. The contested legislation does not violate the prohibitions of our Idaho Establishment Clause since it is intended to aid all school children. Therefore, there can be no overriding or paramount state interest of the type referred to by the majority in this case. The real overriding or paramount interest was constitutionally declared by the legislature in I.C. § 35-1501; *i. e.*, the public policy provision to have all school children bussed.

The majority has stated that " * * * busing benefits are denied to all students who attend *religious* schools and this is the Idaho Constitution's *price for exercising one's religious beliefs.*" Such a position is in direct contravention of the United States Supreme Court's mandate in *Sherbert* unless Idaho could show a paramount state interest. This cannot be done. The Idaho legislature has unequivocally characterized its legislative or public policy as providing transportation for public and private school students, the primary requirements which are the health, safety and welfare of those pupils. Again, the question is presented— how can the judicial branch completely ignore the legislative function and take upon itself to declare and characterize the legislation as religious? Such a position is untenable.

Furthermore, the aforementioned majority fiat is directed only at students who attend *religious* schools. The majority has ignored and left up in the air those students who attend nonsectarian private schools. Are they to be treated as the majority would treat religious school pupils? Or are they to be treated as public school pupils?

Since I am forced to speak to "religious" issues as a result of the majority opinion, I must conclude that it is at least clear that compelling a child of sectarian beliefs to attend a public school would violate his constitutional rights under the Free Exercise Clause as set out in the *Pierce* case, *supra,* and embodied by I.C. § 33–202. It should also be clear that compelling a child of sectarian belief to make a choice of attending public schools and forfeiting his right to ride public school buses, denies him his rights guaranteed under the Free Exercise Clause and also denies him Equal Protection of the law by creating an unreasonable classification in establishing criteria for public transportation to schools.

I.C. § 33–1501 does not violate the Establishment Clauses of either the Idaho or the U.S. Constitutions. There have been four United States Supreme Court opinions in this area which, while not binding on this Court in this instance, are highly persuasive. This is especially true since, contrary to the position of the majority, I interpret the Idaho Constitutional provision in art. IX, sec. 5 as being as restrictive as the First Amendment of the United States Constitution, not more restrictive. The Idaho constitutional provision regarding Establishment of Religion and the United States Constitutional provision are essentially the same. The words may vary but the effect was intended to be the same.

---

8. *Id.*, 719.

9. 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

The majority states that the Idaho Constitution, art. IX, sec. 5 requires this Court to focus its attention on the legislation in question to determine whether it is in "aid of any church" and whether it is "to help support or sustain" any church affiliated school. The majority goes on to say that the requirements of this constitutional provision thus eliminate as a test for determination of the constitutionality of the statute both the "child benefit" theory discussed in Everson v. Board of Education [10] and the standard of Board of Education v. Allen [11] both discussed, infra. There is no mention of the "child benefit" theory in the United States Establishment Clause. Nevertheless, the United States Supreme Court developed such a test as an aid for interpretation of that clause. Similarly our Constitution does not require this Court to apply "aid to religion" in its interpretation.

Everson, supra, is the leading case regarding the constitutionality of school busing statutes. The U.S. Supreme Court by a 5 to 4 decision, upheld reimbursement of parents for fares paid for transportation of students attending public and Catholic schools, the payments being made pursuant to a New Jersey statute authorizing school boards to make contracts for such transportation. The schools were operated by a Catholic priest and in addition to secular education there was religious instruction given.

The Supreme Court upheld the statute and said the school board resolution did not violate the First Amendment prohibiting any "law respecting an establishment of religion," and stated:

"That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be

used so as to handicap religions than it is to favor them.

"This Court has said that parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious rather than a public school if the school meets the secular educational requirements which the state has power to impose. See Pierce v. Society of Sisters, 268 U.S. 510 [, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468]. It appears that these parochial schools meet New Jersey's requirements. The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." [12]

However, the Everson issue was not deemed by many observers as completely settled. This was due in part to certain dicta in the majority opinion written by Justice Black as to the meaning of the Establishment of Religion Clause. Some of this dicta is cited in our majority opinion at pp. 12–13 and also later in this dissent.

The next important case to follow Everson was School District of Abington Township, Pa. v. Schempp,[13] which held unconstitutional required Bible readings in public schools.

The next significant case in this area to follow Everson was Board of Education v. Allen,[14] wherein the Supreme Court upheld a New York statute requiring local public school authorities to lend textbooks free of charge to all students grades 7 through 12, including students attending private parochial schools. The Supreme Court held the statute consistent with the First Amendment requirements since the statute merely made available to all children the benefits of the general program to lend

10. Supra, note 4.

11. 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed. 2d 1060 (1968).

12. 330 U.S. 1, at 18, 67 S.Ct. 504, at 513.

13. 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

14. Supra, note 11.

school books free of charge. In this case, books were furnished at the request of the pupil and ownership remained, at least technically, in the state. No funds or books were furnished to parochial schools, and the financial benefit was held to be to the parents and children, not to the schools.

The Supreme Court went on to say that other cases involving aid to private schools, including Pierce v. Society of Sisters,[15] have:

"been a recognition that private education has played and is playing a significant and valuable role in raising national levels of knowledge, competence, and experience. Americans care about the quality of the secular education available to their children. They have considered high quality education to be an indispensible ingredient for achieving the kind of nation, and the kind of citizenry, that they have desired to create. Considering this attitude, the continued willingness to rely on private school systems, including parochial systems, strongly suggests that a wide segment of informed opinion, legislative and otherwise, has found that those schools do an acceptable job of providing secular education to their students. This judgment is further evidence that parochial schools are performing, in addition to their sectarian function, the task of secular education."[16]

There is little doubt that I.C. § 33–1501 would be held constitutional by the United States Supreme Court. In *Allen, supra,* even the three dissenters conceded the non-idealogical nature of a bus. One of the latest statements by the High Court regarding the First Amendment was in Walz v. Tax Commission of City of New York.[17] While not binding on this Court in the case at bar, it is nevertheless highly persuasive in light of what I consider the essential similarity between the Idaho Estab-

lishment Clause and the United States Establishment Clause. Chief Justice Burger stated in a majority opinion that:

"The hazards of placing too much weight on a few words or phrases of the Court is abundantly illustrated within the pages of the Court's opinion in *Everson.* Mr. Justice Black, writing for the Court's majority, said the First Amendment

'means at least this: Neither a state nor the Federal Government can * * * pass laws which aid one religion, aid all religions, or prefer one religion over another.' 330 U.S., at 15, 67 S.Ct., at 511.

Yet he had no difficulty in holding that:

'Measured by these standards, we cannot say that the First Amendment prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools. *It is undoubtedly true that children are helped to get to church schools. There is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets * * *.*' Id., at 17, 67 S.Ct., at 512. (Emphasis added.)

"The Court did not regard such 'aid' to schools teaching a particular religious faith as any more a violation of the Establishment Clause than providing 'state-paid policemen, detailed to protect children * * * [at the schools] from the very real hazards of traffic * * *.' *Ibid.*

"Mr. Justice Jackson, in perplexed dissent in *Everson,* noted that

'the undertones of the opinion, advocating complete and uncompromising separation * * * seem utterly dis-

15. *Supra,* note 5.

16. 392 U.S. at 247–248, 88 S.Ct. at 1928–1929.

17. 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

cordant with its conclusion * * *.' *Id.*, at 19, 67 S.Ct., at 513.

Perhaps so. One can sympathize with Mr. Justice Jackson's logical analysis but agree with the Court's eminently sensible and realistic application of the language of the Establishment Clause. In *Everson* the Court declined to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history. Surely, bus transportation and police protection to pupils who receive religious instruction 'aid' that particular religion to maintain schools that plainly tend to assure future adherents to a particular faith by having control of their total education at an early age. No religious body that maintains schools would deny this as an affirmative if not dominant policy of church schools. But if as in *Everson* buses can be provided to carry and policemen to protect church school pupils, we fail to see how a broader range of police and fire protection given equally to all churches, along with nonprofit hospitals, art galleries, and libraries receiving the same tax exemption, is different for purposes of the Religion Clauses." [18]

Thus, we can see that the thrust of *Everson* not only is still viable, it has been expanded by *Walz*. Like the First Amendment to the U.S. Constitution which was interpreted by Justice Black in *Everson* to prohibit "aid" to religion, our Idaho provision framed in terms of "any aid" to religion should not be interpreted with "a literalness that would undermine the ultimate constitutional objective as illumi-

nated by history." That objective is to preserve "the autonomy and freedom of religious bodies while avoiding any semblance of established religion." [19]

The constitutional posture of the U.S. Supreme Court regarding state transportation legislation for the public as well as the private (including parochial) school pupils is clear. However, the position taken by various state courts has been varied in the past. The majority in the case at bar has adopted the view sometimes referred to as the "strict view" which, since *Everson*, has become a minority view and is contra the trend among state courts towards the *Everson*-type approach. This "strict view" holds that the primary purpose of legislatively created transportation programs for public as well as for parochial students versus the broader class of private school children is to promote the interest of the religious or sectarian institution versus that of the child. The contrary or *Everson* position now taken by the majority of state courts is sometimes referred to as the "child benefit" theory. This position views the direct or primary benefits of school transportation legislation as flowing to the children in providing for their safety and holds that parochial schools only receive an indirect benefit.

When *Everson* was before the U.S. Supreme Court in 1947, both the "strict view" position and the "child benefit" position as taken by the various state courts at that time were before it. At that time the states were about equally divided as to which position to take. Subsequent to 1947 the equal division did not remain as *Everson* had its effect on the state courts. [20]

18. *Id.*, at 670–672, 90 S.Ct. at 1412, 1413.

19. Secular, neutral and non-idealogical services such as bus transportation have again been upheld by the U. S. Supreme Court in the very recent case of Lemon et al. v. Kurtzman, Superintendent of Public Instruction of Pennsylvania, et al., 401 U.S. 931, 91 S.Ct. 2105, 29 L.Ed. 2d 745, June 28, 1971.

20. *See*, for example, Americans United Incorporated as Protestants & Other Americans United for Separation of Church and State, et al. v. Independent School Dist. No. 622, Ramsey County, 288 Minn. 196, 179 N.W.2d 146 (1970) ; Opinion of the Justices, 109 N.H. 578, 258 A.2d 343 (1969) ; Alexander v. Bartlett, 14 Mich.App. 177, 165 N.W.2d 445 (1968) ; Squires v. Inhabitants of City of Augusta, 155 Me. 151, 153 A.2d 80 (1959).

Furthermore, most of the state decisions relied upon in the majority opinion were heavily influenced by the New York case of Judd v. Board of Education,[21] which was one of the first and most influential courts to apply the "strict view." The *Judd* philosophy was subsequently abandoned by the same New York court in favor of an *Everson*-type approach.[22] *Judd* and its followers also erroneously doubted the continued viability of *Everson.* Nevertheless the post-*Everson* trend has clearly been away from the "strict view" and towards the "child benefit" position, which position is well established in reason as well as the weight of authority.

For the aforementioned reasons the judgment of the district court should be affirmed.

21. 278 N.Y. 200, 15 N.E.2d 576 (1938).

22. *Supra,* note 11.